174 So.2d 881 (1965)
Vivian LaBue AVERETTE, Ind., etc., Plaintiff-Appellees,
v.
The TRAVELERS INSURANCE COMPANY et al., Defendants-Appellants.
No. 6355.
Court of Appeal of Louisiana, First Circuit.
April 12, 1965.
Rehearing Denied May 24, 1965.
*882 Tom F. Phillips, of Taylor, Porter, Brooks, Fuller & Phillips, Richard C. Cadwallader, Charles H. Dameron, of Durrett, Hardin, Hunter, Dameron & Fritchie, Baton Rouge, for appellants.
Vanue B. Lacour, A. A. Lenoir, G. T. Owen, Jr., of Borron, Owen, Borron & Delahaye, M. Aubrey McCleary, Jr., of McCollister, Belcher, McCleary & Fazio, Robert L. Kleinpeter, of Kantrow, Spaht & Kleinpeter, Charles W. Roberts, of Burton, Roberts & Ward, Joesph F. Keogh, of Franklin & Keogh, David W. Robinson, of Watson, Blanche, Wilson, Posner & Thibaut, Philip K. Jones, D. Ross Banister, Norman L. Sisson, Thomas A. Warner, Jr., for Department of Highways, Baton Rouge, for appellees.
Before ELLIS, LOTTINGER, LANDRY, REID and BAILES, JJ.
BAILES, Judge.
This is a tort action. Plaintiffs are: Mrs. Vivian LaBue Averette, surviving widow of decedent, Glynn E. Averette, appearing in this action individually and as the duly qualified natural tutrix of her five minor children; and two major children, Marvin Glynn Averette and Jeanette Averette Matson. The latter two named plaintiffs are children of decedent, born of a previous marriage. The named defendants are: M. McFields, a resident of East Baton Rouge Parish, his employer, West Baton Rouge Parish School Board, and their liability insurer, The Travelers Insurance Company; George F. Stevenson, a resident of East Baton Rouge Parish, his employer, State of Louisiana, through the Department of Highways, and their liability insurer, Insurance Company of the State of Pennsylvania; Percy J. Rome, a resident of East Baton Rouge Parish, and his insurer, State Farm Mutual Automobile Insurance Company; Marcus Rambo and James R. Hilyer, both residents of East Baton Rouge Parish; however, service citation was not made on James R. Hilyer, nor did he make an appearance in the suit, thus no judgment was rendered against him, and he is not now a party to this action.
The plaintiffs bring this action against the defendants seeking a judgment, in solido, for damages, both general and special, arising out of the alleged tortious death of Glynn E. Averette.
On the ground that there was no genuine issue as to material fact as between plaintiffs and defendants, Percy J. Rome and State Farm Mutual Automobile Insurance Company, these two defendants filed a motion for summary judgment. The trial court, after hearing this motion, sustained the defendants' motion and dismissed the action against them. No appeal was taken from this judgment, dismissing these parties from the suit.
After trial on the merits, the trial court rendered judgment, in solido, against M. McFields, West Baton Rouge Parish School Board and The Travelers Insurance Company, and dismissed, with prejudice, the plaintiffs' action against all other named defendants. From this judgment, M. McFields, West Baton Rouge Parish School Board, and The Travelers Insurance Company appealed. The plaintiffs answered the appeal, seeking an increase in quantum.
At the outset, it should be noted that the State of Louisiana, through the Department of Highways, is made a party defendant by the authority of and through *883 permission granted specifically by Act 55 of the 1963 Regular Session of the Louisiana Legislature; and the West Baton Rouge Parish School Board was made a party defendant herein by the authority of and through permission granted specifically by Act 61 of the same session of 1963.
As a result of the accident which gave rise to this litigation, five separate suits[1] were filed in the 19th Judicial District Court of East Baton Rouge Parish, and all were consolidated for the purpose of trial.
The following facts surrounding the locus of the accident and other pertinent facts were agreed to and stipulated as facts by all parties: The accident occurred on December 12, 1961, at about 11:30 a. m., on the Scenic Highway in the city of Baton Rouge, at or near the intersection of Woodlawn Street, which dead-ends at Scenic Highway at the entrance to the industrial plant of Copolymer Corporation, and Scenic Highway. Scenic Highway runs north and south, has two lanes for northbound traffic, and two lanes for southbound traffic. Each lane is approximately ten feet in width, and the northbound and southbound lanes are separated by a median of asphalt construction about 11 inches in width with rounded top about five inches high. There were six vehicles ultimately involved in the series of collisions. A white Chevrolet sedan owned by Levingston Supply Company, Inc., driven by Percy J. Rome, a 1951 Cadillac owned and driven by James R. Hilyer, a 1960 Chevrolet school bus owned and driven by Emmanuel McFields, and a 1960 Pontiac sedan owned by the Department of Highways of the State of Louisiana, driven by George F. Stevenson, all occupied the two northbound lanes of traffic; and a 1959 Chevrolet Station Wagon owned by East Baton Rouge Parish Sheriff's Department, driven by Glynn E. Averette, and a 1956 Dodge owned by Ruth Rambo and driven by Marcus Rambo, occupied the two southbound traffic lanes.
The street surface was wet, and a mist of rain was falling at the time of the accident. Scenic Highway is of concrete surface, straight and comparatively level.
It was further stipulated that The Travelers Insurance Company was the liability insurer of the West Baton Rouge Parish School Board and Emmanuel McFields, covering the latter's 1960 Chevrolet school bus, with a coverage of $20,000 for any one person, and $200,000 for any one accident, and $5,000 for property damage; and that the Insurance Company of the State of Pennsylvania issued and provided liability insurance coverage for the 1960 Pontiac sedan owned by the Department of Highways in the amount of $20,000 for any one person, and $100,000 for any one accident, and $10,000 for property damage.
The record discloses that immediately prior to the accident, Rome had stopped his Chevrolet sedan in the inside northbound traffic lane, and was waiting for southbound traffic to pass in order that he could make a left turn into the Copolymer entrance. Immediately behind the Rome vehicle was the Hilyer Cadillac, also stopped, waiting to make a left turn into the Copolymer entrance. Approaching these two vehicles from the rear in their lane, the inside lane, was the Chevrolet school bus driven by McFields. In the outside northbound lane and ahead of the school bus was the Pontiac driven by *884 Stevenson. At the same time, some distance north of the place where the Rome vehicle and the Hilyer vehicle were stopped, travelling in the inside southbound lane was the Chevrolet station wagon driven by Averette, and about even or slightly to the rear of this station wagon was the Dodge sedan driven by Rambo. All of the occupants of the various vehicles were alone, except Stevenson, and he was accompanied by a fellow employee of the Department of Highways, James H. Drake. Mr. Drake was seated on the right side of the front seat.
Other than the investigating officers, the photographer and the motorist travelling immediately in rear of Rambo, no witnesses were presented to the court to testify regarding the accident other than the drivers and occupants of the vehicles involved, including Mr. Drake, the passenger in the Stevenson vehicle. Mr. Glynn E. Averette, driver of the station wagon, was killed instantly in the collision of his vehicle with the school bus.
The trial judge did not assign written reasons in casting McFields and The Travelers Insurance Company in judgment. It is apparent, however, that he held that McFields alone was guilty of acts of negligence that were the sole proximate cause of the accident and resulting damages. The trial judge did assign written reasons in finding that the West Baton Rouge Parish School Board was liable for the negligence of McFields. The trial judge held that the travel or journey which McFields was engaged in, that is, in going from his home to the Cohn Elementary School to pick up children for a trip into Baton Rouge was in the service and for the benefit of McFields's employer, the School Board.
While there is considerable conflict in the testimony of some of the occupants of the vehicles, it can be stated with certainty that the school bus was the vehicle that set in motion the chain reaction which ultimately involved all six of the vehicles. A multitude of pictures were introduced in evidence, a thorough investigation of the accident was made by the Baton Rouge Police Department, a number of interesting photographs were produced by the Department, some illustrative photographs and measurements of certain vehicles were made by Mr. Doyle, and obviously extensive and intensive preparation was made for the trial of this matter in the lower court; however, none of these singularly or in concert furnish the key to the solution of the cause of the accident. The cause of this accident can be resolved by the consideration and evaluation of the testimony of McFields, Stevenson and Drake, and aided appreciably by a consideration of some of the photographs. For instance, the photographs of the Pontiac sedan conclusively demonstrate that this vehicle did not strike, with its front end, the school bus, as heavy as it was, with such force as to unseat a person from the driver's seat, throw him over backwards into the aisle. In fact, the photographs just referred to, show that the Pontiac did not strike any object with its front end. Likewise, the photographs of the rear of the school bus demonstrate that it did not receive such a force in its rear to throw a person backwards out of the driver's seat into the aisle.
The following is the essence of the main points of the testimony of McFields. He testified that he had been driving a school bus for about 17 to 18 years; that his bus was in good mechanical condition; that his brakes were good; his tires were good; that he was driving along at a speed of 20 to 25 miles per hour; that he noticed a vehicle in front of him [the Hilyer Cadillac]; that he had followed this vehicle for some distance and was a good distance from it when he noticed that it had stopped; and when he was asked, "What did you do when you saw it stopped?", his reply was:
"Well, when I got close I hit my brakes the first time just to kind of *885 slow up, and then after I come close there to the intersection where I should stop with plenty of time to stop I applied my brakes to stop, and when I applied my brakes for the stop something struck me and struck me from the rear and it knocked me right backwards over my seat back down the aisle of that bus."
(Page 111 of testimony)
Then McFields was asked if when he hit his brakes to stop did the bus "swerve or anything or was it still going," his reply was:
"Not at that second time it didn't swerve any. When I hit it the first time it just a little bit, not swerve, you know, but like on a wet street just slipped a little bit, and I released the brakes and went on maybe from here to that door over there. Well, when I applied the brakes to stop, just about the time I applied my brakes to stop good, something struck me from the rear and knocked me straight backwards over my seat down the aisle, and from there on I didn't know anything. When I came to, well, the policemens (sic) was there and the whistles was blowing and the lights was flashing and when I went to get up, well, my side, it looked like it was broke in two, I couldn't hardly move, and I went to stand on my feet and they give away and I had a chill right at that time. So I finally hobbled out of the school bus and made it on over to a police car and asked him would he let me get in his car and he saidand I asked him to call school board that I had had a wreck, and I also asked him would he get me an ambulance but he said all the ambulances was gone but would call one and so he did."
(Pages 111-112 of testimony)
Subsequently, McFields testified that "I know something struck me very hard, whatever it was that hit me." It is pertinent to note at this time that Mr. Drake testified that after the collisions were over he noticed McFields was walking around in front of the school bus, and that he saw no obvious signs of injury. Likewise, it should be mentioned that McFields gave Dr. M. J. Rathbone, Jr., according to the latter's testimony, a history of his injuries when the doctor first saw him, including this:
"* * * At the time of the accident he stated that he was driving a school bus and when applying the brakes the bus skidded, he was hit from behind, he was knocked loose from the steering wheel and thrown to floor."
A condensation of Mr. George F. Stevenson's testimony is that he was driving in the outside northbound lane, and had been driving in that lane from about Weller Ave. [about three-fourths of mile south of the scene of accident]; that his first notice of an impending accident was when he felt the back end of his automobile swerve to the right and at that time, out of the corner of his eye, he could see the upright post of the cab of the school bus; that this occurred when he was about 35 to 40 feet from the Hilyer Cadillac; that with the swerving of the back of his car to the right, his car headed into the right side of the Hilyer Cadillac that was stopped as described supra. He testified positively that he had not seen the school bus prior to the time he saw it when he felt the rear of his car swerve to the right. He further testified that he had maintained a steady speed, and had not applied his brakes. Finally, he testified that he did not hear any impact with the school bus, but that what he felt was more of a shoving reaction than an impact. When interrogated about the action of his vehicle after the initial impact with the Cadillac, Mr. Stevenson testified that his vehicle pivoted or swung around and possibly struck the Rome vehicle. It came to rest wholly within the northbound lanes headed in a southwesterly direction.
*886 Mr. James H. Drake, who was the passenger seated along side Mr. Stevenson, testified that he had his left arm on the back of the seat facing in the direction of the steering column and looking to the left front; that the school bus was in the act of passing the Pontiac; that as it drew alongside and a bit in front of the Pontiac, the rear end skidded to the right and made contact with the Pontiac. There was a pushing action which pushed the Pontiac's rear end to the right followed by an impact which threw the Pontiac out of control; that after this second impact, the Pontiac was out of control, then it struck the Hilyer Cadillac and the Rome Chevrolet. On cross-examination, Mr. Drake placed the rear of the school bus even with the rear fender and door of the Pontiac at the time of the impact between the two vehicles.
The evidence shows that after the contacts were made between the vehicles in the northbound lanes that the school bus was out of control, that it crossed the median of Scenic Highway, and made contact with the Chevrolet station wagon driven by the deceased, Mr. Averette; then the station wagon, in turn, struck the Rambo Dodge, causing the damage to it and the personal injuries to Marcus Rambo. The photographs demonstrate clearly a violent impact between the school bus and the station wagon. It could well be that in this impact with the station wagon, McFields was thrown from his seat onto the floor of the bus.
From a careful, meticulous and painstaking consideration of all the testimony, photographs and exhibits, the inescapable conclusion we reach is that the series of collisions involved in this accident were set in motion by the sole negligence of McFields in his inattention to his driving duties and the manner in which he attempted to stop his bus. No witness, except Rambo who very vaguely and indecisively placed a vehicle in the rear of the school bus, placed any vehicle to the rear of the school bus. McFields testified that he did not look to see if any vehicle was to his rear preparatory to stopping because, he says, he was not going to make any turn. The only vehicle that was in the proximity of the school bus was the Department of Highways Pontiac. The Pontiac, unquestionably, did not strike the school bus. It must be recalled that McFields testified that his school bus was struck from the rear with such force that it "knocked me right backwards over my seat back down the aisle of that bus."
It follows then that McFields, and the party or parties responsible for his grossly negligent acts must be held liable for the damages resulting from the actionable negligence of McFields. We, just as did the trial court, find that the other defendants were guilty of no negligence in this accident.
This brings us to the consideration of the question of the liability of the West Baton Rouge Parish School Board for the actionable negligence of McFields. In the consideration of this question of vicarious liability, we have for consideration the testimony of McFields, Mr. James D. Olinde, the business manager of the West Baton Rouge Parish School Board, and Jonathan W. Vaughn, principal of the Cohn Elementary School, one of the schools to which McFields delivered to and from which he picked up school children.
McFields testified that he was employed by the School Board as a school bus driver and that he was paid to operate the school bus to haul children, and that he received a base salary and mileage for the distance travelled in picking up the children from their homes, delivering them to the school, and from the school back to their respective homes, but for other than specified extracurricular trips and activities, the school board does not pay for any extra trips that are made by the various classes. He testified that the trip planned for the day of the accident was not a trip for *887 which he would have been paid by the school board; that he is not paid mileage in going to the place where he picks up the first child, nor is he paid mileage after he discharges the last child in delivering the children from school at the end of the day.
Jonathan W. Vaughn, principal, testified that McFields had no other duties at his school other than delivering the children to and returning them from school, but that he did use his bus for special trips and on those occasions he was paid on a per child trip basis by the children themselves; that McFields was under no obligation to make any special trips.
In considering this question of liability of the School Board for the tortious acts of its employee, we must bear in mind that there are two separate and distinct transactions or involvements to be considered.
Admittedly, in transporting school children to and from school, McFields is an employee of the School Board. The School Board has the right to regulate, dictate and prescribe how he shall carry out his duties. That is a part of his contract. For labor and equipment used in this operation, he is paid a certain salary per month, plus mileage. This mileage is calculated only on the number of miles travelled from the point where the first child is picked up on the route to school and back to the point where the last child is discharged.
The fact is that the School Board has not undertaken to regulate, in any manner, these special trips. Mr. Olinde testified that the School Board was not aware of the proposed trip until after the accident Mr. Olinde testified that the routing of the school buses is one of his primary duties; that McFields was employed to serve the Cohn Elementary and Cohn High Schools. His route was designated by him (Olinde) and it consisted of picking up children beginning at a certain point in the morning, delivering them on time for the beginning of school, and his next duty commenced at the dismissal of school, which is returning them to their respective homes. In response to the question if anyone exercised any control over the bus drivers during the period from when they deposited their children until they picked them up again, Mr. Olinde replied, "No, sir, we have no control whatsoever over those bus drivers. There are several that have different jobs in between that time. Some maintain stores and different businesses. Their primary responsibility is what I just mentioned." He testified that he was aware that special trips are sometimes made. Further, he was questioned as to what the School Board's policy was with respect to the transportation on these special trips. He replied that the School Board had no policy with reference to requiring the bus drivers to make them; that the School Board had bus drivers for the purpose of bringing children to school and returning them to their homes at the end of the day. The School Board does not require bus drivers to make any special trips during the day or at night. When asked, if any are made, how the arrangements are made, his reply was, "The arrangements are made by the, well, primarily by the principal, and it's on a negotiated basis, voluntary basis as far as the bus drivers are concerned. We have some that have never made any extra trips. They do it for the purpose of picking up extra money and strictly on the basis of what they determine is a fair value for the services"; that no principal has the authority to require bus drivers to make special trips, and that the School Board has never discharged any driver for failure to make a special trip; that if school bus drivers will not make the trip, there have been occasions when Greyhound Bus Lines or some other commercial lines are employed; and that there are no regulations of the School Board that prohibit bus drivers from hauling other persons on the bus during the hours they are not hauling school children.
*888 We find nothing in the record that would restrict McFields in the operation of his bus, or to prevent him having complete proprietary control over the operation of it while on this particular trip. As we appreciate the arrangements for the special trip, he had agreed to pick up and transport the children from Cohn Elementary School to certain points in Baton Rouge; that this was to be done during school hours; that the trip had been called off because of inclement weather and McFields had returned home. Later in the morning, he received a call to return to the school, that the trip would be made. This accident occurred on the way to Cohn Elementary School to make this trip. There is nothing in the record to indicate that the principal or the teacher that would have accompanied him with the children would have had the right to control the actual operation of the bus during this trip. He, of course, would have had control of the speed at which he would drive, the route he would have taken, the seating arrangement within the bus, etc., with the principal or teacher directing the trip only as to time and points of destination.
In Hartwig Moss Ins. Agency, Ltd. v. Board of Com'rs of the Port of New Orleans (1944) 206 La. 395, 19 So.2d 178, the court quoted approvingly from 21 Words and Phrases, Perm.Ed. p. 100; on Independent Contractor:
"An independent contractor is one who renders service in the course of an occupation representing the will of his employer only as to the result of his work, and not as to the means by which it is accomplished."
Also see: Alexandria v. Frost Lumber Industries, D.C., 88 F.Supp. 516, 5 Cir., 187 F.2d 27; Amyx v. Henry & Hall, 227 La. 364, 79 So.2d 483; Eames v. Alexandria Contracting Co. Inc., La.App., 154 So. 510, 512.
In Blashfield Cyclopedia of Automobile Law and Practice, Vol. 5, § 2962, it is stated:
"* * * The general rule is that, where one has contracted with a competent and fit person, exercising an independent occupation, to do a piece of work not in itself unlawful or attended with dangers to others, according to the contractor's own methods, and without his being subject to control, except as to the result of his work, the relationship is that of an independent contractor, and not that of a servant."
See LaCaze v. Beeson (1950) 1 Cir.App., 44 So.2d 493, and the authorities cited therein.
§ 2963"The chief consideration which determines that one is an independent contractor as to the mode of doing the work contracted for, but only as to the result to be achieved. Control within such rule means complete control or the full and unqualified right to control and direct the details of, or the means by which, the work is to be accomplished. It is the right to control the details of the work and not the fact of actual interference in such work that distinguishes between an independent contractor and a servant. * * *."
§ 2964"In determining whether or not one is an independent contractor, it is also important to ascertain whether he renders the service in question in the course of an independent occupation. * * * One who, in the exercise of an independent occupation, contracts to accomplish a specified piece of work for an agreed lump sum, thereby establishes a typical relationship of independent contractor."
In 56 C.J.S. Master and Servant § 3(1), p. 41, it states:
"An independent contractor is one who, exercising an independent employment, *889 contracts to do a piece of work according to his own methods, without being subject to the control of his employer except as to the result of his work. * * *."
Under the conditions that existed at the time of the contract of hiring of the McFields' bus for the trip to Baton Rouge, the School Board was not a party to the contract and did not have any right of control over the trip. It could have become a party to the contract, if it should have desired, but to do so would invoke a change of actual facts existing at the time the trip [and contract] was negotiated for by the principal of the school.
We find that McFields was an independent contractor in the proposed performance of the special trip, and of course, there is no liability on the part of the contractee for the negligent acts of the independent contractor.
Appropriate here is the case of Beck v. Dubach Lumber Co. (1930) 171 La. 423, 131 So. 196, on page 197, wherein the court said:
"[2] And our own courts have repeatedly held that the mere fact that a proprietor retains general supervision over work to be constructed for him by another, for the purpose of satisfying himself that the contractor carries out the stipulation of his contract, does not make him (the proprietor) responsible for the wrongs done to third person in the prosecution of the work [and cited cases]." Also see: Merritt et al. v. E. L. Bruce Co. et al. (1936) La.App., 166 So. 195.
Conscending arguendo, that McFields was an employee of the School Board, we find, and so hold, the School Board is not liable.
LSA-C.C. Article 2320, makes the employer liable for the damages occasioned by the fault of their employees, under the doctrine known as respondeat superior if they, the employees, are "in the exercise of the functions in which they are employed." This quoted phrase from the article of the civil code is the way the Code expresses the term so well known in workmen's compensation case interpretations of "in the course and scope of employment," however, the Codal expression is not subjected to the same liberal construction and interpretation that we find the courts attaching to "in the course and scope of employment."
The general rule recognized in most jurisdictions, and followed in Louisiana, is that an employee, in considering tortious liability of the employer for the negligence of his employee, in going to and from work is not "in the exercise of the functions in which they are employed." In other words, an employee in going to and from work is not "in the course and scope of employment" in the intendment of Article 2320, and accordingly, we hold the employer, School Board, is not liable therefor under Article 2320. See: Cado v. Many (1938) La.App., 180 So. 185; Whittington v. Western Union Tel. Co. (1941) La.App., 1 So.2d 327; Boyce v. Greer (1943) La.App., 15 So.2d 404; and Romero v. Hogue (1955) La.App., 77 So.2d 74.
There is an exception to this rule, however; and that is that the master is liable if this travel to and from work benefits or serves the interest of the employer. See: Harding v. Christiana (1958) 103 So.2d 301; Cado v. Many, supra; and Boyce v. Greer, supra. Also see: Wills v. Correge (1963) La.App., 148 So.2d 822.
The burden of proof rests on the plaintiffs to show that the facts warrant the application of the exception to the general rule; the plaintiffs must show the interest of the employer was benefitted by McFields driving his school bus to Cohn Elementary School on this occasion. The plaintiffs have not shown any facts to warrant the application of the exception stated supra.
This brings us to the consideration of quantum. The deceased, Glynn E. Averette, *890 was 49 years of age at the time of his death. He had been married twice. He was survived by two major children born of the first marriage, namely: Mrs. Jeanette Averette Matson and Marvin Glynn Averette. The surviving Mrs. Averette testified that Mr. Averette and all of the children, as well as herself, were very close to each other, that they and the major children lived close together and had many family gatherings and "get-togethers." Petitioner, Mrs. Averette, was 32 years of age, and the children of her marriage to decedent were respectively 14, 12, 11, 10 and 9 years of age at the time of the demise of Mr. Averette. Mr. Averette was employed by the Sheriff's Department of East Baton Rouge Parish and had been so employed for the past 16 years, and his salary was $450 per month.
The trial court awarded the following amounts for loss of support:

Mrs. Vivian LaBue Averette $35,000;
Lynn Wade Averette, age 14 3,000;
David Darryl Averette,
 age 12 3,500;
Peggy Jan Averette, age 11 4,000;
Bonnie Gayle Averette,
 age 10 4,500; and
Betty Sue Averette, age 9 5,000.

The award in favor of Mrs. Averette of $35,000 is fair and adequate for loss of support, however we feel that the amounts awarded the five minor children are inadequate. We believe that the award to each of the minor children should be and is hereby increased an additional $4,000 each.
The trial court made the following awards for loss of love and affection:

Mrs. Vivian LaBue Averette $15,000;
Lynn Wade Averette 3,000;
David Darryl Averette 3,500;
Peggy Jan Averette 4,000;
Bonnie Gayle Averette 4,500; and
Betty Sue Averette 5,000.

The award in favor of Mrs. Averette is affirmed; however, we feel that the award for the five minor children for an item of damage of this sort does not and cannot lend itself to a sliding scale. We feel that, as each of these children were members of the household of which their father was a part and head of, and that the loss of which a monetary value must be placed, as wholly inadequate and feeble as it is, is a present and sustaining loss to each of the household members, with their ages being as close as they are, an equality in award is warranted and indicated. We believe that each of the minor children are entitled to an award of $7,500 for the loss of love and affection of their father.
We believe, too, that the award in favor of the two major children is inadequate. It appears that both were very close to their father, enjoyed many family gatherings together, lived in the same city not very far apart, and were still very much a part of the family. The trial court awarded each of the major children $2,000 for loss of love and affection. We feel that this amount should be increased to $6,000 each.
For the foregoing reasons, the judgment, insofar as it holds the West Baton Rouge Parish School Board liable for the negligent acts of Emmanuel McFields, is reversed and set aside, and there is judgment in favor of West Baton Rouge Parish School Board and against the plaintiffs rejecting their demands against it; and further the judgment in favor of the plaintiffs and against the defendants, Emmanuel McFields and The Travelers Insurance Company, in solido, by increasing the amounts awarded to each plaintiff as hereinabove stated, however, the extent of liability of The Travelers Insurance Company is limited to the principal sum of $20,000, as provided by the terms of its liability insurance policy issued to Emmanuel McFields; and in all other respects, the judgment appealed from is affirmed, at defendants' costs.
Amended and affirmed.
NOTES
[1] The suits consolidated for purposes of trial with the instant action are: Marcus M. Rambo v. Insurance Company of the State of Pennsylvania et al., No. 6353; Percy J. Rome v. M. McFields et al., No. 6354; Department of Highways, State of Louisiana v. Manuel McFields et al., No. 6356; and Emmanuel McFields v. George F. Stevenson et al., No. 6357. The issues common to all the cases will be decided in the instant case; however, the issues peculiar to each of the other cases will be decided in separate opinions and judgments therein rendered this date.