228 So.2d 522 (1969)
Beatrice S. SOILEAU et al., Plaintiffs and Appellees,
v.
CONTINENTAL INSURANCE COMPANY et al., Defendants and Appellants.
No. 2898.
Court of Appeal of Louisiana, Third Circuit.
November 25, 1969.
Rehearing Denied December 18, 1969.
Writ Refused February 6, 1970.
*523 Lewis & Lewis, by Seth Lewis, Jr., Opelousas, for defendants-appellants.
Donald-Soileau, Mamou, for plaintiffs-appellees.
Before TATE, CULPEPPER and MILLER, JJ.
CULPEPPER, Judge.
This is a wrongful death action. Plaintiffs are the widow and three major children of Joseph L. Soileau, who died as a result of injuries received when the automobile which he was driving was struck by a large gravel truck driven by the defendant, Charles W. Harrell, and insured by the defendant, Firemen's Insurance Company of Newark, New Jersey.[1] From an adverse judgment, the defendants, Firemen's Insurance Company of Newark, New Jersey, and Charles W. Harrell, have appealed.
The issues are (1) the negligence of the defendant truck driver, (2) the contributory negligence of the deceased driver of the automobile and (3) the quantum of the awards.
The accident occurred at the junction of State Highway 376 with State Highway 13 in the Reddell community about two miles from the City of Mamou. Both are two-lane, two-way, blacktopped thoroughfares. Highway 13 runs generally north and south and Highway 376 east and west, intersecting the west side of Highway 13 and forming a T-intersection. The speed limit on Highway 13 is 45 miles per hour.
Plaintiffs' version of the accident is that the deceased was driving north on Highway 13 intending to turn left onto Highway 376. He turned on his left blinker lights, reduced his speed or stopped, looked to his rear and was unable to see the defendant's truck because of the heavy fog and the excessive speed at which the truck was approaching. Mr. Soileau started his left turn and when the front wheels of his vehicle had cleared the intersection and were on Highway 376, the right front of *524 the truck struck the left rear door of the Soileau automobile.
Defendants' version of the accident is that Harrell was driving north on Highway 13 at a speed of about 45 miles per hour and saw the Soileau automobile approximately one-half mile ahead. Harrell says that although he had previously passed through spots of fog, there was very little fog at the scene of the accident. The defendant driver admits he was very familiar with the intersection, having passed there during recent weeks approximately ten times a day hauling gravel. Despite this knowledge, Harrell initiated a passing maneuver. When he reached a point approximately fifty feet from the intersection, Soileau started his left turn. Harrell was unable to stop his truck and the collision ensued.
The first issue is whether the truck driver was negligent. We have no difficulty concluding that he was. He was passing at an intersection in violation of LSA-R.S. 32:76.
Defendants contend this was not an intersection within the contemplation of the cited statute, since there were no signs or yellow lines and it was difficult to observe. In Fontenot v. Pan American Fire & Casualty Company, La.App., 209 So.2d 105 (3rd Cir.1968) writ of certiorari refused, we reviewed at length the jurisprudence on the question of what constitutes an intersection within the meaning of the statute. Generally, the junction of a hard surfaced state highway with a narrow, unmarked, gravel or dirt road, does not constitute an intersection. However, the intersection of two hard surfaced state highways of about equal width and in a thickly populated community is clearly an intersection. As pointed out in the Fontenot case, neither the statute nor the jurisprudence requires that there be signs or markings of the intersection. This one was not only clearly visible but we have the added fact that the truck driver was very familiar with it.
Additionally, the defendant driver was negligent in traveling at an excessive speed in view of the fog-reduced visibility and the presence of the intersection. Harrell admits he was driving about 45 miles per hour, which was the speed limit. We agree with the trial judge that even this was an excessive speed under the circumstances. However, Harrell was probably driving even faster. The facts show that the impact of the two vehicles was terrific. The automobile was either knocked or rolled north along Highway 13 and thence across a considerable ditch on the east side, finally coming to rest about 480 feet from the point of impact. The truck, after striking the automobile, also proceeded in a northerly direction along Highway 13 and then went off on the east side, striking a concrete culvert, crossing the ditch and coming to rest on an embankment near a residence a distance of about 276 feet from the point of impact.
Harrell testified his truck was empty and that at 45 miles per hour he could stop it within 120 feet. The fact that he was unable to stop it within a distance of approximately 325 feet (including the 50 feet south of the intersection when he said he first realized Mr. Soileau was going to make a left turn) corroborates the contention that the truck was exceeding the legal limit of 45 miles per hour.
A more serious question is whether the deceased was guilty of contributory negligence. In the very similar case of Fontenot v. Pan American Fire & Casualty Company, supra, we set forth the applicable law as follows:
"When a left turn is being made at a place other than an intersection, as for instance at a private driveway, the jurisprudence requires a very high degree of care. The driver executing such a left turn must not only give a proper signal but must also observe both oncoming and following traffic to ascertain that the turn can be made with safety. McCann v. Mercer, 191 So.2d 150 (La.App. 3rd Cir.1966).

*525 "In judging the reasonable care required of a person making a left turn at an intersection, there is the added factor that, under certain circumstances, a motorist can assume that the following traffic will observe the law and will not pass at the intersection. See Breland v. American Insurance Company, 163 So.2d 583 (La.App.2nd Cir.1964) and the cases cited therein. However, if the motorist about to make the left turn sees or should see that a following vehicle is engaged in a passing maneuver, in close proximity to his own vehicle and at an intersection, he can no longer rely on the presumption that the following vehicle is going to obey the law."
Under the rules quoted above, Soileau had a right to assume that following traffic would observe the law and would not pass him at the intersection, until such time as he saw or should have seen that defendant's truck was in close proximity and engaged in a passing maneuver.
A controversial issue is the extent to which Soileau's visibility was impaired by the fog. State Trooper McGee, who arrived on the scene immediately after the accident, about 6:40 a. m. on November 13, 1967, testified there was a solid blanket of fog reducing visibility of vehicles to about 200 feet. He said the maximum safe driving speed under the circumstances was 30 to 35 miles per hour. Trooper Fontenot, who arrived at the scene at about 7:00 a. m., said the fog was spotty and he did not remember the distance of visibility. Pictures which he took without a filter, because of the foggy condition, show there was fog but visibility of vehicles was more than 200 feet. However, Fontenot testified these pictures were taken at about 7:10 a. m. and the fog had lifted a little by that time. Gilbert J. Guillory and Curtis Lafleur, witnesses for the plaintiff, characterized the fog as "heavy."
On the other hand, the defendant Harrell and two of his witnesses, Tayo Guillory and L. C. Grey, testified there was no fog at the scene of the accident. In his written opinion the trial judge expressly stated he gave little credence to the testimony of these witnesses.
The trial judge found as a fact that there was a heavy fog and that, in view of the reduced visibility and the excessive speed of defendant's truck, the deceased was not contributorily negligent in failing to see the truck before he initiated his left turn. We find no manifest error in this conclusion.
The final issue is the quantum of the awards. The trial judge awarded the widow $30,000 for loss of love, companionship and support. Each of the three major children was awarded $15,000 for loss of love and companionship. The widow and children were also awarded $7500 for the decedent's pain and suffering during the 39 hours which he lived after the accident, the sum of $800 for the demolished automobile, $1294 for funeral expense and $639.10 for medical expense.
The facts show that Mr. Soileau was 66 years of age at the time of his death. He had been married to the plaintiff widow for 49 years and their relationship was very close. His earnings were only about $20 per week for doing yard work and odd jobs.
The three major children are married daughters who live near their parents and frequently see and visit each other.
Plaintiff cites the recent case of Richard v. American Oil Company, La.App., 213 So.2d 158 (3rd Cir.1968) where we affirmed a district court award of $20,000 for loss of love, affection and support, to a 58 year old widow of a previously healthy 72 year old decedent, who earned $14 to $21 per week as a farm hand.
Defendants cite Waters v. Southern Farm Bureau Casualty Insurance Company, La.App., 212 So.2d 487 (3rd Cir. 1969) where we affirmed a district court award of $12,000 for loss of love and *526 affection, plus $15,000 for loss of support, to the widow of a 67 year old husband who had an income of about $174 per month. Defendant also cites Averett v. Travelers Insurance Company, La.App., 174 So.2d 881 (1st Cir.1965) in which the court awarded the sum of $15,000 for loss of love and affection to the 32 year old widow of the 49 year old decedent.
No case has been cited where the award was near as high as $30,000 to a widow under circumstances similar to those in the present case. Here the loss of support is negligible. The closest case factually is Richard v. American Oil Company, supra, where the award was $20,000. Of course, we are cognizant of Lomenick v. Schoeffler, 250 La. 959, 200 So.2d 127 (1967) and Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963) which hold generally that the amount of an award for general damages lies largely within the great discretion of the trial court and should not be disturbed on appellate review in the absence of an abuse of discretion. However, we think that in the present case the award to the widow for loss of love, companionship and support must be reduced to the sum of $20,000.
As to the awards to the major children, defendants cite Averett v. Travelers Insurance Company, supra, and Richard v. American Oil Company, supra, in which awards of $7500 to major children were affirmed. Plaintiffs cite no case where such an award has exceeded $7500. We think the awards to each of the three major children in the present case must be reduced to $7500 for loss of love and affection.
We find no abuse of the trial court award of $7500 for the pain and suffering of the decedent during the 39 hours which he lived following the accident. He suffered multiple rib fractures and contusions of the heart and lungs. He remained conscious for the entire time and the doctors testified he suffered severe pain. See Richard v. American Oil Company, supra, where we affirmed an award of $3500 for the decedent's pain and suffering for about two hours.
Defendants point out that the award of $800 for the automobile must be reduced to the sum of $750, since the evidence shows the automobile was valued at $800 and had a salvage value of $50. The awards for funeral and medical expense are not disputed.
Defendants complain that the trial court judgment does not limit the liability of the insurer to its maximum coverage of $50,000 caused by the death of any one person and $25,000 property damage. The judgment decrees "that the liability of Firemen's Insurance Company of Newark, New Jersey be limited to $50,000 for the death of Joseph Lee Soileau and $25,000 for the property damages sustained, together with interest thereon from date of judicial demand and costs incurred." We construe this language to limit the liability of the insurer in accordance with the above stated terms of the policy. We fail to understand why defendant complains of this portion of the judgment.
For the reasons assigned, the judgment appealed is amended to reduce the award to the widow, Mrs. Beatrice S. Soileau, for loss of love, companionship and support, to the sum of $20,000; also, to reduce the awards to the major children, Anita S. Fontenot, Bercedine S. Shuff and Sybilene S. Aucoin, for loss of love and companionship, to the sum of $7,500 each; and also the award for the loss of the automobile to the sum of $750. As thus amended, the judgment appealed is affirmed. All costs of this appeal are assessed against the defendants appellants.
Affirmed, as amended.
MILLER, Judge (dissenting).
In my opinion, defendant carried the burden of proving that the left turning motorist was contributorily negligent in making *527 this unsignaled left turn when the passing lane was occupied by an overtaking motorist committed to the passing maneuver. Stewart v. McCarthy, 228 So.2d 215 (La.App. 3rd Cir. 1969).
The trial court and my brothers of the majority base their decision to the contrary on two principal findings of fact. First, that there was a heavy fog reducing visibility. Second, that the overtaking truck was being operated at a high rate of speed something in excess of the 45 miles per hour speed limit in effect at that point. There is testimony indicating that the speed limit for trucks is 50 miles per hour a short distance south of the scene of the accident. Both vehicles approached the scene of the accident from the south.
As to visibility at the time of the accident, it is interesting to note that the majority finds this unmarked, unsigned "T" intersection "clearly visible" to the overtaking motorist, but holds that the fog so reduced visibility of the left turning motorist that he was free from negligence in failing to see the overtaking truck in the passing lane.
Even though the trial judge was unimpressed with the testimony of the truckdriver, the sole surviving witness to this accident (finding it self-serving), there is no question but that the truckdriver saw the lead motorist in time to be entirely in the passing lane before the left turn was commenced. To this factor we must add that the overtaking motorist had only taillights to assist him in seeing the lead vehicle. On the other hand, the left turner should be able to see the overtaking motorist's headlights for some additional distance.
On the issue of visibility, the trial court did not make a finding as to the extent of visibility, but only held that there was a "heavy fog". There is an express finding by the trial court of no credibility to be given to the testimony of defendant and both his independent witnesses who came on the scene shortly after the accident. Since there is no finding that the State Troopers' testimony is not believable, and since both of them are experienced in estimating distances, I am impressed with their estimates of visibility. Furthermore, we have photographs made by one officer 30 minutes after the accident.
Sergeant G. D. McGee, called by plaintiff, has been a member of the Louisiana State Police for twelve years. He lives about 1500 feet west of the intersection where the accident occurred. He completed his tour of duty that morning and approached this same intersection from the north while returning home at approximately 6:30 to 6:35, only five to ten minutes before the accident occurred. He estimates that he was back at the scene of the accident 1½ minutes after the accident. Tr. 140. He described the fog to the north of the accident as "heavy fog", "a blanket fog, solid fog." When he passed the intersection at 6:35 he estimated visibility at two hundred (200') feet, and estimated safe driving speed at about 30 to 35 miles per hour. Tr. 143, 144. He estimated that the truck went a distance of approximately 150 feet after impact, and that the car went a distance of "around three hundred fifty (350') feet." He immediately radioed State Trooper Sergeant Fontenot who was then on duty a few miles away, and Sgt. McGee then attempted to help the injured parties. Sgt. Fontenot arrived a few minutes later and he handled the investigation, while Sgt. McGee handled traffic. While McGee was handling traffic, the fog began to lift. Tr. 146. There was no clarification as to what extent.
Sgt. Floyd Fontenot, called by plaintiff, received the call by radio while patrolling. He drove to the scene of the accident at a speed in excess of 60 miles per hour (Tr. 205), but estimated that a safe speed to drive would have been "Oh, about thirty-five (35), forty (40), forty-five (45) miles an hour, something like that." Tr. 184. He arrived at the scene of the accident at 6:55. He described the fog as "spotty", "a thick fog", "a heavy fog", but refused to *528 estimate the distance to which visibility was restricted on the ground that "it's too far back, I don't remember how far it was." Tr. 208. His estimates of safe driving speed and his own speed show that he found more visibility than was estimated by Sgt. McGee. He stated that the fog lifted a little bit by 7:10 when he took the pictures. As noted in the majority opinion, the photographs show visibility of vehicles was more than 200 feet. As I view the photographs and the testimony of Sgt. Fontenot as to the distance from the impact area to the gravel truck, visibility of unlighted objects or vehicles was at least 500 feet and possibly more than 1000 feet. Unquestionably the headlights of the overtaking truck (it is accepted that the gravel truck was operated with its headlights on) would have been visible at a greater distance.
There is no evidence as to the type of camera, type of lense, focal length of the lense, lense opening, or shutter speed used in making the photographs. The only technical information we have is found at Tr. 215. There Sgt. Fontenot explained:
"A. Yes sir, you can use two types of film, at 3,000 speed or at 200 hundred speed. Now with a 3,000 you've got to use aa filter on it and when it gets to where it's too dark you can take that filter off and still use that 3,000 thousand and catch it without flash attachments, you see.
"Q. I see, so that in order to photograph it it was necessary to use film that would be fast and film that would not have a filter?
"A. Yes sir.
"Q. And this was due to the fog?
"A. That's right.
"Q. At the time
"A. That was early in the morning.
"Q.at the time you took those photographs had the fog, was the fog still of the same intensity or had it lifted between the time that you arrived and the time you made the photograph.
"A. It had lifted a little bit, sir."
The pictures each measure 2 7/8 inches by 3 13/16 inches and there is no evidence to show that they were either enlarged or reduced in size from the original print. From the above quoted testimony and from an examination of the prints, I am led to believe that the Sgt. was using a Polaroid camera. Since a Polaroid camera automatically compensates for light conditions, the fact that the filter was removed may not be meaningful. It does confirm the fact that Sgt. Fontenot thought that the available light required him to remove what must have been a "neutral density" filter. The absence or presence of such a filter should have no appreciable effect on the showing of visibility. It would only serve as an aid in controlling exposure. Scott Photo. Evid. 2nd Ed. § 92. Focus would have an effect, but there is no evidence showing on what object Sgt. Fontenot had focused. Since he was concerned with skid marks, it may have been that he had focused for a relatively short distance. This in itself without the fog would have the effect of making the distant objects out of focus and make them appear less clear. Additionally, the prints are "thin" indicating that an improper exposure was used, (Scott, Photo. Evid. 2nd Ed. § 99), notwithstanding the fact that the camera presumably had an electronic shutter. Proper exposure is essential to get maximum resolution. Improper exposure gives less detail and makes the picture appear less clear.
The only witness mentioned in that portion of the trial court's opinion dealing with visibility was plaintiff's witness, Mr. Gilbert Guillory. His testimony concerning the fog was "Well, it was heavy, I don't remember exactly how heavy, I mean I consider it was a heavy fog." Tr. 168. He was not asked to define what he meant by "heavy fog", and he never did give an estimate as to how far he could see.
*529 Taking the evidence from this witness, and the two State Troopers, both of whom impressed me, and the photographs in evidence, and disregarding defendant's and his witnesses' testimony, we must find that there was at least 200 feet of visibility at the time of the accident. I am convinced that the overtaking truck's headlights were visible to the left turning motorist for substantially more than this 200 feet. But in any event, they must have been clearly visible for at least 200 feet.
How fast was the gravel truck moving prior to impact? The trial court and the majority stress the damage to the vehicles and the distances they moved after impact, and conclude that this establishes great speed by the overtaking motorist. A certain speed is not suggested, just in excess of 45 mph.
It is difficult to determine what damage was sustained by the right front of the gravel truck in the impact with the lead vehicle, because this is the portion that struck a concrete culvert about 40 feet from the point where it came to rest. The concrete culvert undoubtedly caused more damage to the truck than the original impact.
As to the distance the truck moved after impact, Sgt. McGee and Mr. Guillory both estimated it to be only 100 to 150 feet. The photographs in evidence also suggest that the truck moved a lesser distance than indicated by Sgt. Fontenot and accepted by the trial court. In any event, the truck was out of control and sliding along in a ditch containing sewage for a good part of this distance.
At Tr. 163 Mr. Guillory explained what he found when he went to Mr. Soileau's car:
"A. * * * I went to the car and the
 old man, the best I could understand,
 he must have stepped on
 the feeder or he was down by the
 accelerator there, he was down
 he was kind of on the seat and
 down at the bottom.
 BY THE COURT: (To the Witness)
 "Q. On the floorboard?
 "A. On the floorboard."
This could explain the relatively long distance traveled by Soileau's automobile after impact.
Even if we were to find that the overtaking truck was traveling 60 miles per hour, 200 feet of visibility would allow the left turning motorist more than two seconds to see and avoid the overtaking truck. At 50 miles per hour, Soileau would have had about three seconds. 500 feet of visibility would have given him almost 6 seconds to see the overtaking headlights if the truck was traveling 60 mph, and almost eight seconds at 50 miles per hour.
I find it difficult to distinguish Stewart v. McCarthy, 228 So.2d 215 (La.App. 3rd Cir., 1969) from this case, except that it appears to me that the left turner was more negligent here than in Stewart. In Stewart, the left turning motorist was held contributorily negligent for failing to see an overtaking motorist that was passing a line of following vehicles which had slowed to permit the left turner to complete his signaled turn. Here, there was no other traffic and the overtaking motorist was in the left lane some time before the left turn was commenced. Since the overtaking motorist saw and reacted to the lead vehicle and its tail lights, there is no reason why the left turning motorist, had he looked, could not see the overtaking truck and particularly, its headlights.
In Stewart, the impact occurred off the highway. Here the impact occurred in the center of the passing lane. In Stewart, the overtaking motorist skidded more than 100 feet before impact. Here only 25 feet or less. (See photographs).
The majority opinion does not discuss the failure of the lead motorist to give a turn signal. Although the trial court specifically made a finding of fact that a left *530 turn signal was given, this is based on questionable evidence. This finding was based in part on testimony by decedent's son-in-law that the left turn signal was still blinking after the accident. This was not noted by several other impartial witnesses, all of whom had more opportunity to observe this fact. Additionally, the turn signal handle was demolished in the accident. I cannot find that plaintiffs proved that the left turn was signaled. This too, is additional basis for my position that there was more reason to have granted recovery to the left turner in Stewart, than in this case.
I respectfully dissent.
On Application for Rehearing.
En Banc. Rehearing Denied.
HOOD, J. and MILLER, J. are of the opinion that a rehearing should be granted.
NOTES
[1] The suit was originally filed against Ready Mix, Inc., the owner of the truck, Continental Insurance Company, insurer of the vehicle and Charles W. Harrell, the driver. At the conclusion of the trial it was stipulated that the proper defendants are Charles William Harrell, Firemen's Insurance Company of Newark, New Jersey, and Ready Mix, Inc. However, we notice that the judgment in favor of plaintiffs is only against the defendants, Charles Harrell and Firemen's Insurance Company of Newark, New Jersey. There is no judgment read and signed against Ready Mix, Inc.