200 So.2d 127

**Otis LOMENICK**

**v.**

**Paul H. SCHOEFFLER, d/b/a Schoeffler Cadillac et al.**

No. 48469.

June 5, 1967.

Rehearing Denied June 30, 1967.

J. Minos Simon, Lafayette, for plaintiff-relator and amicus curiae.

Wm. B. Baggett, Lake Charles, Frank S. Bruno, Harold J. Lamy, of Dodd, Hirsch, Barker & Meunier, New Orleans, Bob F. Wright, of Domengeaux, Wright & Bienvenu, Lafayette, W. T. McCain, Colfax, Floyd J. Reed, of Reed, Reed & Reed, Herman M. Schroeder of Hattier, Schroeder & Kuntz, New Orleans, Gerard F. Thomas, Jr., of Thomas & Friedman, Natchitoches, for amicus curiae.

Nicholls Pugh, Jr., of Pugh & Boudreaux, Lafayette, for defendant-respondent.

HAWTHORNE, Justice.

We granted a writ of review in this whiplash type injury case in which the Court of Appeal reduced the judgment of the district court based on a jury verdict from $10,000.00 to $5500.00 because we considered that the opinion of the Court of Appeal revealed that the reduction was made on the basis of classification of the injury as "moderate" rather than on any substantial, specific reasons compelled by the particular facts and circumstances of this case.[1] The Court of Appeal did indicate by certain language that it understood the "rationale behind the appellate review of general damages", which is to give effect to the large discretion of the trier of fact in determining the amount of these damages, but nothing was revealed by the opinion as to how this great discretion had been abused in this case.

We made clear in Gaspard v. Lemaire, 245 La. 239, 158 So.2d 149, as extended in Ballard v. National Indemnity Company, 246 La. 963, 169 So.2d 64, and its companion cases,[2] that a type of injury has little significance for determining the amount of

---

1. The opinion of the Court of Appeal in this case is reported in 191 So.2d 315. In that court the respondent Hartford Accident and Indemnity Company conceded its liability to relator. The only issue was the amount of the award.

2. Cormier v. Traders & General Insurance Company, 246 La. 976, 169 So.2d 69; Winfree v. Consolidated Underwriters, 246 La. 981, 169 So.2d 71.

damages, but that each case must be evaluated according to its own peculiar facts and circumstances as to the damage caused by that type of injury. We considered that we had rejected completely any appellate approach to damages for whiplash injuries based on classification of them into categories of "severe", "moderate", or "mild" when we expressly overruled Cassreino v. Brown (La.App.), 144 So.2d 608, in Winfree v. Consolidated Underwriters, 246 La. 981, 169 So.2d 71. By that ruling we rejected categorization for the purpose of appellate adjustment of the amount of damage awards in these whiplash type injury cases.

The term whiplash type injury means nothing more in itself than the manner in which the injury is received—that is, by a sudden and violent change of motion of the body likened to the lash of a whip. The injury usually resulting is to the neck or spine. The facts and circumstances of this case illustrate forcefully what we thought we had made clear in Gaspard, Ballard, and its companion cases how emphasis on the classification of the injury by appellate courts as severe, moderate, or mild rather than on the specific symptoms of pain and discomfort, their severity, effect, and duration, can serve to interfere with the great discretion of the trier of fact in determining the amount of the award.

The injury in this case resulting from an automobile accident on November 30, 1963, manifested itself as so trivial in terms of fracture and dislocation of the spine that no more significance was given to it in the beginning by the doctors than a "shaking up" with full recovery expected within a few weeks. The injury on the contrary had an insidious progress of cumulative symptoms of pain, discomfort, and aggravation resulting in a permanent damage causing continuing limitation in the relator's normal functioning as an individual, more aggravated at some times than at others.

At the moment of the accident late on a Saturday afternoon the relator Otis Lomenick, a lease broker in his early fifties living in Lafayette, Louisiana, was not aware that he had suffered any injury whatever. Over the weekend he became aware of pain and soreness in his right hip, chest, and neck. On Monday he went to his physician, a general practitioner, Dr. Jack H. Gani, with these complaints but was complaining more of the chest and hip than of the neck. X-rays taken by Dr. Gani revealed no fracture or dislocations, and he treated the relator conservatively with muscle relaxants and pain relievers. The chest and hip complaints disappeared, but the neck pain and soreness persisted, and Dr. Gani referred him to an orthopedist after about five weeks. This orthopedist, Dr. Fred C. Webre, because his X-rays and examination revealed at most a minor strain to the neck, gave the relator no treatment, but allowed him to return to Dr. Gani for continuation of the

same conservative treatment, expecting complete recovery in a matter of weeks.

In spite of the continuation of this treatment the pain, discomfort, and muscle tenderness in his neck continued, and about two months after the accident he began to suffer frontal headaches, tinnitus (a ringing in the ears), and loss of strength in his neck. Examination by an ear specialist showed that nothing was wrong with the ears to cause the ringing. At about the fifth month he began having a blurring of vision and disturbance of vision, twitching and excessive tearing in the eyes. An eye examination showed nothing to be wrong with his eyes.

In addition to the painful stiffness in his neck which gave him difficulty in moving his head and neck, he experienced a loss of his normal vigor and stamina, felt tired, heavy, and "washed out" with awkwardness in both arms, sometimes more in one arm than in the other, accompanied by uncontrollable and unpredictable dropping of objects. He suffered dizziness and lightheadedness on bending over, became upset easily, and was very irritable with periods of depression. During the ninth month a limitation in neck motion became definitely apparent to Dr. Gani. Dr. Gani then considered that he had a condition which would not improve with further treatment, and he discharged him.

In the meantime, about six months after the accident, the relator had consulted Dr. Blaise Salatich, an orthopedist in New Orleans, whose clinical and X-ray examination revealed an injury to the cervical area. This injury was revealed to him in the X-rays by a slight narrowing between the fourth and fifth cervical vertebrae as compared to the spaces between the other cervical vertebrae, and a minimal hypertrophic spurring of the third, fourth, and fifth cervical vertebrae. As he appreciated the delicate structure of the neck, even slight abnormality in its structure could account for significant symptoms. He suggested that the relator see an orthopedist who has received worldwide recognition as an authority on neck or cervical injury, Dr. Ruth Jackson of Dallas, Texas. That she enjoys such recognition was agreed to by Dr. Webre, who testified for the respondent as to his examination of the relator within weeks of the accident with no significant findings as set out above.

Dr. Jackson testified by deposition in the case that when she saw the relator a year after the accident, she found by clinical and X-ray examination that the relator had suffered an injury to the soft tissue structure of the neck, sprain injury of the ligaments and capsules which hold the bones together, and a compressive type injury of the interarticular isthmus (a spongy bone structure) of the fifth cervical vertebra, and of the upward lip of the sixth vertebra. She also found evidence of irritation of the nerve roots at the back of the neck and of the sympathetic

nerve supply in the neck. All of his symptoms in her opinion were consistent with the injury she found.

She found limitation of motion of his head and neck, tenderness over all the joints at the back of the neck on the right side, more marked on the lower joints, and some localized muscle spasm of the muscles above the right shoulder blade and some spasm of the muscles at the sides of the neck. By moving his head and neck, and then his head only, in all directions she found limitation of motion in all directions varying from 30 to 45 degrees except that there was no limitation in bending the neck and head to the left.

The ligament damage was demonstrated to her by the fact that when she bent his head forward, the ligament at the back of the neck, the nuchal ligament, became very taut and stood out like a rope, indicating loss of flexibility from scarring. Her finding of injured ligaments was further confirmed by the X-rays which showed that the second cervical vertebra was rotated to one side. She explained that injury to one of the ligaments which held this bone in place would allow this rotation to occur.

The compressive damage at the fifth and sixth vertebrae was revealed in the X-rays by a narrowing at the fifth vertebra and a flattening of the lip on the sixth vertebra.

The nerve root and sympathetic nerve supply irritation was evidenced to her by the fact that pain was increased by applying pressure to the top of the head, that the reflexes in his arms were sluggish, that his right arm was smaller than his left when it should have been larger in a right-handed person, indicating atrophy or shrinking of the muscles, that the blood pressure in his right arm was elevated, and that he had some decrease in the gripping power of his left hand.

She made it clear that an injury to the soft tissue structure of the neck can cause involvement of the joints in the cervical area which will produce compression or irritation of the nerve roots which will never be revealed by X-ray. She explained that these injuries to the soft tissue structure, and compressive type fractures of the bones, manifest themselves slowly over a long period, and that the swelling accompanying the hemorrhaging of the torn ligaments may be so deep within the neck structure as to go undetected at the time.

It was a well-known fact, according to her, that it was usual for persons with such injury to the neck to have the symptoms relator complained of from his eyes and ears without eye and ear examination revealing any abnormality of these organs. She evaluated his condition as to what he could expect in the future from it as follows:

"This patient can look forward to continued symptoms referable to his neck. The symptoms may be better at times and they

may be worse at times. This will depend to a great extent upon his own activities, what he does and how he does it, and to some extent upon weather changes, because we know that weather changes do cause changes about joints that are injured or that are painful, and changes in the weather can cause increased symptoms. As time goes on there will be further thickening and scarring of the ligaments that have been injured, there will be further formations of osteophytes or bony spurs at the margins of the vertebrae. However, there will be times when he will be relatively free of pain and there will be other times when his pain will be exacerbated or aggravated just by the usual activities of everyday living."

A neurosurgeon, Dr. Joseph M. Eddleman, who examined relator on behalf of the respondent three days after Dr. Jackson's examination, testified that his complete neurological examination including X-rays revealed that the relator in his opinion had suffered nothing but a very trivial injury.

Dr. Jackson examined him again about 10 months later, just before the trial, and found evidence of further deterioration of the cervical area; a further manifestation of irritation of the sympathetic nerve supply, a dilation of the right pupil; and indication of some irritation of the spinal cord itself by an absence of the right knee jerk. Her evaluation as to the outlook of his future condition remained essentially the same.

At the trial commencing on November 9, 1965, almost two years after the accident, the relator and his wife both testified as to how his painful symptoms, discomfort, and limitations had altered his functioning as a businessman, as a husband, and as a father to three of his four children still living at home.

He testified that the ringing in his ears is constant, more pronounced at some times than at others, and the excessive tearing and mucus forming in his eyes prevent him from reading more than 30 minutes at the time. Although he takes aspirin in quantity to relieve his pain and discomfort, he cannot remain in one position for long or pursue any activity for longer than an hour. He suffers from nervousness and irritability which were not present before the accident, and if his activity involves using his arms, he especially gets an exhausted, "washed out" feeling. His irritability and difficulty in handling his papers and typewriter have caused him to forego much of the field work involved in taking leases, and he now hires others to do this work with the lessors. His nervousness causes him to get vexed and annoyed easily with his family, children, and associates, and his solution is just to walk away from the situation causing irritation for a while. He has much discomfort when he drives long distances, and now gets others to drive for

him or resorts to plane travel. Waking several times each night is usual, and he invariably wakes in the morning with a headache which he described as a "general" one, explaining that the piercing headaches he previously had through his eyes have gradually given way to these "general" headaches.

We recognize that in cases of this type the Constitution makes it the duty of appellate courts to review both the law and the facts, but in their examination of the fact these courts must give effect to the basic law set out in Article 1934(3) of our Civil Code that in the assessment of damages in cases of offenses and quasi offenses "much discretion must be left to the judge or jury". This law is plain and means what it says, and it is the duty of all appellate courts to follow it. Under this rule the amount of damages assessed by the judge or jury should not be disturbed unless the appellate court's examination of the facts reveals a clear abuse of the discretion vested in the lower court.

The facts and circumstances of this case do not reveal that the jury abused its discretion in awarding the relator

$10,000.00 as damages for his injury. The facts and circumstances in the other neck injury cases involving much smaller awards,[3] relied upon by respondent as showing that this award was all out of proportion with previous awards for similar injuries, cause them to have little or no relevancy for the purpose of demonstrating the excessiveness of this award.

We agree with the Court of Appeal that the record does not show that the lower court erred in refusing to admit certain offerings for the purpose of establishing expenses claimed as special damages. The judge of the district court refused to admit them as prematurely offered because their identity as expenses incurred because of this injury was unclear; and as relator failed to further identify them before the trial was over, they remain unproven and we cannot award these items to relator.

For the reasons assigned the judgment of the Court of Appeal is reversed and set aside, and the judgment of the district court is reinstated and made the judgment of this court. All costs are to be paid by defendant-respondent.

McCALEB, J., concurs in the result.

3. Winfree v. Consolidated Underwriters (La.App.), 163 So.2d 377, aff'd 246 La. 981, 169 So.2d 71; Doucette v. Primeaux (La.App.), 180 So.2d 866; Sebren v. Millers Mutual Fire Insurance Company of Texas (La.App.), 182 So.2d 99; Robinson v. American Home Assurance Company (La.App.), 183 So.2d 77.