SAVOY, Judge.
Plaintiff brought suit on behalf of his minor son, Jimmy Michael Pellerin, for injuries sustained by the son in an automobile accident, and individually, for medical expenses incurred by plaintiff. At the time of the accident, the son was fourteen years of age.
Trial by jury was had in the lower court solely on the question of the quantum of damages, the negligence of defendant’s assured being stipulated. The jury returned a verdict for plaintiff for $330.00 medical expenses, and $500.00 for and on behalf of the minor son.
Plaintiff has appealed that verdict as inadequate.
The sole issue for decision is the adequacy of the jury’s award as it related to the amount awarded for the boy.
The accident occurred near Lake Charles, Louisiana, on December 18, 1965. Plaintiff and his son were riding in a van truck being driven by plaintiff in his employment as a dairy routeman. Defendant’s assured entered the highway in the path of the truck, colliding with it and causing it to careen across the highway and through a shallow ditch. In the process, the boy struck his head against the windshield.
Jimmy Michael Pellerin was examined by Dr. Harry S. Snatic nine days after the accident, at which time he was complaining of headaches. Dr. Snatic could find nothing seriously wrong, but subsequently had him referred to a neurosurgeon.
Dr. R. C. L. Robertson, a neurosurgeon, first examined him on March 23, 1966. He was then complaining of headaches, dizziness and stomach ache, although the frequency of those incidents had begun to subside. With regard to his past history, the doctor was informed that he had never had any previous injuries and had never *779 required the services of a physician. The doctor felt that the injury sustained in the accident was not significant in that he was not immediately rendered unconscious, thus ruling out a concussion. The boy was apparently dazed and/or partially unconscious within a few minutes after the accident, since his father, plaintiff herein, testified that he had to assist the boy to a nearby motel shortly afterwards. An electroencephalogram was performed, showing no abnormality other than fourteen and six per second positive spike brain wave activity, reflecting a mild abnormality consistent with head injuries.
Dr. Robertson examined him again on .August 10, 1966, and January 3, 1967. A repeat electroencephalogram at the August visit showed the same brain wave activity, but the headaches had subsided to a much milder degree and the dizziness and stomach problems had not recurred. Neurological examination was negative in all respects. In January of 1967, neurological examination revealed no neurological -changes. An electroencephalogram was not made at that time. The doctor stated that, objectively, there were no findings of •consequence on any of the three visits. However, he stated that, ■ based on the history given him, he could only conclude that the somewhat abnormal brain wave activity was related to the accident. Following the January, 1967 examination, he was to see the boy again in three months. Since the trial was held in the latter part of January, 1967, we are without benefit of the results of any further examinations.
Jimmy Michael Pellerin was also examined by Dr. Earl H. Rafes, a neurosurgeon. The date of his examination does not appear from the record. His examination revealed no abnormality of any kind, including the electroencephalogram, and all factors were within normal limits.
Neither of these two doctors had been informed, at the times of their examinations, that the boy had been hit in the face with a baseball bat some four years prior to the time of the accident in question, but neither thought it would be significant if he had not been knocked unconscious, which was apparently the case. Dr. Rafes, however, did not feel that the brain wave activity found by Dr. Robertson was necessarily significant in the absence of a more or less obviously serious head injury, such as one that causes immediate unconsciousness.
While neither of those two doctors found •anything objectively wrong with the boy,Dr. Robertson did lean a little more toward a causal connection between the brain wave activity and the accident than did Dr. Rafes, and to that extent their testimony might be said to be in conflict.
We turn, then, to the lay testimony, which consisted of that of plaintiff, the boy, his mother, Mrs. Nelma Pellerin, and his aunt, Mrs.' Wilda Parker. Their testimony can be digested by saying simply that they testified that the boy had not been as physically active since the accident, and that his grades in school had worsened. His report cards were not produced, however, and the testimony on that point was anything but conclusive, other than to show that his grades in Physical Education had remained the same before and after the accident, namely “A”. Likewise, the testimony with regard to his general physical condition strikes us as somewhat inconclusive. It reflected that he suffered from headaches, dizziness, etc. for some time after the accident, but also that, with the passage of time, the problems became less severe and/or disappeared, as was reflected in the testimony of Dr. Robertson. It is our view that the lay testimony does not substantially alter the medical findings. The jury did not abuse the much discretion vested in it. Lomenick v. Schoeffler, 200 So.2d 127, decided June 5, 1967, by the Louisiana Supreme Court; LSA-C.C. Article 1934, Section 3.
For the reasons assigned, the verdict is, therefore, affirmed. Costs of this appeal are assessed against appellant.
Affirmed: