TATE, Judge
(dissenting).
After a three-day trial, in which the trial judge and jury had an opportunity to observe Mrs. Richard constantly, the trier of fact concluded that she was permanently disabled and awarded her $21,200. No application was made to the trial judge to reduce the verdict as excessive. Yet this court rediagnoses the causes of Mrs. Richard’s disability, finds her symptoms of pain imaginary and her undoubted loss of wages unnecessary, and reduces the award in half. On the basis of the cold record and thirty minutes of oral argument, we find she was cured five months after the accident, although without dispute she remained away from work and still was under a doctor’s treatment at the time of the trial, some eighteen months after the accident.
1.
Before discussing the record in detail, it may be appropriate to point out an obvious error of law of the majority.
The trial was held almost eighteen months after the accident. At that time, Mrs. Richard.had lost seven thousand dollars wages, must of which the majority disallows.
Without contradiction the evidence shows that Mrs. Richard had tried to return to work twice but was unable to continue because of complaints of pain. It further shows without contradiction that her attending specialist (Dr. Salatich), who examined and treated her repeatedly between May 16, 1967, and the trial a year later, had advised her to refrain from working because, due to his diagnosis of her injuries, her work as cashier would cause pain and aggravate her symptoms. Tr. 198-99, 201—2.
Assuming most favorably to the appellant that Dr. Salatich’s diagnosis and advice were incorrect, nevertheless the tortfeasor is responsible for these additional damages resulting from the tort-caused personal injury. Where a person has suffered personal injury by reason of another’s negligence, the tortfeasor is liable for any additional harm and expense caused the injured person by the mistake (or negligence or lack of skill) of the attending doctor. Thibodaux v. Potomac Insurance Co., La.App. 1st Cir., 201 So.2d 159, 165-167; Hudgens v. Mayeaux, La.App.3d Cir., 143 So.2d 606, certiorari denied; Kimball v. Audubon Insurance Co., La.App.1st Cir., 103 So.2d 525; Annotation, 100 A.L.R.2d 808, 813 (1965); Restatement of Torts 2d Section 457 (1965); 25 C.J.S. Damages § 20; 22 Am.Jur.2d Damages, Sections 112-14.
2.
In reducing the award, the majority concludes that Mrs. Richard was able to return *679 to work five months after the accident. We base this conclusion on the testimony of several doctors who saw Mrs. Richard only once (as compared with her attending specialist, who saw her frequently over an extended period of time), and most of whom saw her only in the first three or four months following the accident — at a time when, although she was still complaining, the permanence or not of her symptoms could not be evaluated except as a guess.
In, holding that the lady’s undoubted loss of seven thousand dollars wages was unnecessary (and that her physician erred in his diagnosis recommending that she stay away from work), we overlook that the examining doctors acknowledge that, if indeed the symptoms of pain did persist until the trial some seventeen months later, then they themselves were erroneous in their optimistic assumption in the early days following the accident that the lady’s serious injuries[1] were only temporary. Reading the cold record, without benefit of observation of the plaintiff and possibly her pain-lined demeanor and guarded movements, we assume that her symptoms of pain are imaginary or malingered, even though every physician who examined her found at least some objective evidence of them (although perhaps evaluated such residual as temporary or not as intense as that of which the lady complains).
With great respect for my brethren of the majority, the writer feels that once again we are overlooking the primary function of appellate review of quantum. It is not to reduce all awards which appear to us to be high. It is not for ourselves to reevaluate the medical testimony, because we have personal confidence in some specialists and not in others, based on assumptions or knowledge gained from our own experience outside the record and not before the trier of fact.
Once again, because the injury was technically caused by “whiplash”, we view the residual as within a category of “whiplash injuries” for which a ten thousand dollar award is appropriate. Because we so categorize it, we disregard this particular plaintiff’s permanent crippling as a residual of the accident and this particular plaintiff’s loss of seven thousand dollars earnings at the date of the trial (as well as her permanent loss of income of over four thousand dollars a year for the rest of her life).
We were reversed in Lomenick v. Schoeffler, 250 La. 959, 200 So.2d 127, for similarly disregarding substantial medical testimony supporting a jury verdict and for similarly tampering upon appeal with a jury verdict where there was no clear abuse of the great trial court discretion to award general damages for personal injuries, Civil Code Article 1934(3), after taking into consideration that “each case must be evaluated according to its own peculiar facts and circumstances as to the damage caused by that type of injury.” 200 So.2d 129.
3.
The following more detailed analysis of the transcript is for the benefit of the parties and of any higher courts which review this record, since I suppose that upon application for rehearing our tampering with the jury verdict will be attacked as not only erroneous under the law of Louisiana but also as unconstitutionally violating the Seventh Amendment to the United States Constitution. See Hood, Recent Developments: Trial by Jury, 20 Alabama Law Review 76 (1967).
At the risk of being tedious, the writer intends to discuss the medical testimony at length. The 400-page record includes nearly 300 pages of testimony. The majority’s short summary of it must of necessity simplify and generalize. However, in the writer’s opinion, by so doing important points have been omitted which explain and justify the jury verdict.
For instance, the opinion states simply that Dr. Salatich, the orthopedist, examined *680 the plaintiff on May 16, 1967. It omits description of the circumstance that Dr. Salatich examined and treated her as her attending physician from May, 1967, until April, 1968, when the trial took place, seeing her periodically during this year.
Again, in describing the testimony of Dr. Schexnaildre, the initial attending general practitioner, the opinion notes this amateur psychiatrist’s opinion was that the plaintiff’s nervousness was the cause of her pain.[2] It also notes his opinion that she did not want to return to work because of a disagreement with her employer[3], overlooking his further evaluation that, however, “I think she was interested in getting well.” Tr. 45.
To recapitulate the facts:
The accident occurred on November 13, 1966. At the time of trial seventeen months later, Mrs. Richard still complained of disabling neck and back pain following exertion, such as housekeeping. She has intermittent spells of painfulness; for instance, five days of neckache and back ache, followed by some two-three days of slight pain except upon exertion, then another painful episode of a day or so, etc. In the early days following the injury, she twice tried to return to her job as head cashier at $84.40 per week; she was unable to keep on because of painful aftereffects.
The chief witness testifying to a sound medical basis for her complaints is Dr. Blaise Salatich, an orthopedist. She reported to him for examination and treatment following May 16, 1967 (when, as will be noted, she had been discharged from further treatment, by other physicians).
Based upon observation and upon objective evidence (x-ray evidence of spinal column curvature and of subluxation or displacement of vertebrae), Dr. Salatich concluded that the primary cause of disability was a stretching or tearing of the ligamentous structure about the neck vertebrae which had, through minute internal bleeding, produced permanent scarring which caused pain and a burning sensation through nerve irritation. Tr. 191-95. This also resulted in limitation of motion. He recommended that she restrain her physical activity to avoid pain. Tr. 198. He was of the opinion that this disabling condition resulted from the accident.
The appellants very strongly contend, however, that Dr. Salatich must be mistaken in his diagnosis. They rely upon the allegedly contrary testimony of all other medical witnesses. Initially, the writer was impressed by the contention; but, for reasons to be stated, he does not feel that the other physicians’ testimony in context justifies us to modify the jury’s award as an abuse of the fact-trier’s great discretion in determining general damages.
*681 Dr. C. J. Schexnaildre, a general practitioner, was the initial attending physician. He discharged her on April 5, 1967, some five months later, feeling she could return to work. He thought her pain in March and April was primarily a nervous and emotional aggravation of the physical residual. In February, three months after the accident, x-rays did show evidence of skeletal spasm in the neck possibly indicative of a more lasting soft-tissue injury, Tr. SO, although he thought it might be due to nervous anxiety deepening the symptoms of the trauma, Tr. 51. At the time of discharge, she had a full range of motion of the neck, Tr. 55, but she complained of a pulling sensation of the neck, burning sensations, and the other symptoms which form the basis of Dr. Salatich’s diagnosis of a soft-tissue injury. Dr. Schexnaildre did not feel it was a soft-tissue injury because some of the symptoms did not develop until three months later, but he also admitted her symptoms could also have been indicative of nerve damage or ligament damage, Tr. 52, Tr. 50-53, 55.
Dr. Thomas Lee Duncan, an orthopedic surgeon, examined Mrs. Richard once, at the request of Dr. Schexnaildre. This was on March 13, 1967, some four months after the accident. He found the x-ray evidence of what could be muscular spasm of the neck (a straightening of the normal curvature), Tr. 104, as well as evidence of some limitation of motion in the neck, Tr. 102. Because of the lack of other objective manifestations, he felt Mrs. Richard was essentially able to return to work. However (and this is significant for present purposes, in the light of subsequent examinations by other physicians showing greater disability, and in the light of the limited appellate function to test whether there is an abuse of discretion), the doctor also stated that the patient’s complaints, if they persisted, were consistent with a soft-tissue injury such as to that which the plaintiff seeks to prove as permanently disabling her. Tr. 89-90, 95-97.
Dr. Fred Webre, an orthopedic surgeon, examined Mrs. Richard once, on December 7, 1966, within a month of the injury. While he felt the more probable diagnosis to be cervical strain with only temporary disability, this expert also admitted that the symptoms of which Mrs. Richard complains and their persistence were consistent with a more serious soft-tissue injury, as were the symptoms he observed. Tr. 123—25, 127, 137.
Dr. Michael Boustany, a physician and surgeon, examined Mrs. Richard immediately after the accident in the emergency room of the hospital. He found the cervical sprain injury, but no fracture necessitating immediate hospitalization. He released the patient to return to treatment by her family physician.
It is to be noticed that these latter four doctors examined or treated Mrs. Richard only during the first months after the accident. Three of them saw her only once. They all recognized she had a painful neck injury and a less serious low-back strain, but they all prognosticated she should or would recover, although all of them found symptoms of at least some residual,' however slight they felt it. They felt that Mrs. Richard had received what was essentially only a spraining injury to the neck which should eventually cure itself with time, and their essential reason for not diagnosing a more permanent soft-tissue damage was the lack of more pronounced symptoms during the first three months.
However, those of the medical witnesses interrogated on the question admitted that the pain-relieving drugs prescribed by Dr. Schexnaildre could mask other symptoms to some extent. They also' admitted that, if Mrs. Richard’s complaints of the persistence, location, and type of pain were valid, she might indeed have sustained a soft-tissue injury producing a more enduring residual.
Of the five medical witnesses so far discussed, only Dr. Salatich had examined or treated Mrs. Richard after her discharge by *682 Dr. Schexnaildre in April, 1967. However, on March 28, 1968, immediately before the trial, the defendant obtained an examination of this lady by Dr. Cecil W. Lowrey, an orthopedic surgeon.
This examination by Dr. Lowrey, some sixteen months after the accident, corroborated Dr. Salatich’s findings that some symptoms had persisted and thus indicates that the prognostication of the other four physicians for an earlier cure had proven incorrect. He found x-ray evidence (straightening of the curvature) which by reasonable medical probability was due to muscle spasm, Tr. 260, further admitting that “muscle spasm is secondary to some irritative factor such as lesion of the ligaments or other soft tissue structure in the cerivical”. Tr. 260. He also found limitation of rotation of the neck. Tr. 262. He then testified that the accident could have been the cause of this neck condition, as well as of activating the low-back defect into painfulness, although he could not say definitely that the accident was the cause. Tr. 260-64. He also stated that this condition could cause painfulness if she attempted to return to work, Tr. 271-72, although he recommended that she try to do so, Tr. 274.
Substantial medical evidence thus tends to prove Mrs. Richard had sustained permanent soft-tissue injuries causing her pain upon exertion, as well as continuously recurrent painful episodes. In the past, awards of from ten to fifteen thousand dollars general damages for pain and suffering resulting from this type of injury have been approved. See Luquette v. Bouillon, La.App.3d Cir., 184 So.2d 766. Additionally, here Mrs. Richard has sustained a loss of almost seven thousand dollars wages ($84.40 per week, for eighteen months) by the trial, and the future earning capacity of this 40-year-old widow for herself and her child is indefinitely restricted.
Under these circumstances, I cannot say that the trial jury abused its discretion in awarding this plaintiff $21,200. By so tampering with the jury verdict, my esteemed brethren of the majority are unintentionally usurping for this remote appellate tribunal what is properly a function of the trial court (who has seen the witnesses and has had an opportunity to evaluate the sincerity of the patient’s complaints of residual pain) to order remittitur upon application for new trial, LSA-C.C.P. Art. 1813. (It is of some interest that no application for remittitur was made by the appellant in the trial court, which could have given the trier of fact the opportunity to express its own evaluation of the verdict, whether or not such application was granted.)
For the reasons too lengthily expressed, the writer respectfully dissents from his brethren’s reduction of the trial court’s award.

. The majority recognizes them to be so, in awarding ten thousand dollars for them.

. See the doctor’s testimony under cross-examination at Tr. 62:
“Q. In your examinations and treatments from November of 1966, on, is it not your opinion or your feeling that the complaints •which she was making during these periodic visits were due to the nervousness which she had at that time and which she had had previous to this?”
“A. No. I think she had pain from the accident. Now, from the time of the accident in November, it is my opinion that the pain that she had maybe from February and March and so on was being aggravated by her nervousness and anxiety, and I don’t think that she should have had pain that long from the injury —it was my personal opinion."

. Apparently based upon this doctor’s impression for treatment of an unrelated illness in 1965, some two years earlier, for an unrelated illness. Tr. 65-66. This 40-year-old widow was the sole support of herself and her child. She was a valued employee and her employer was anxious for her to return to work during the Christmas season. After two attempts she was unable to do so. The physician’s only comment as to any current disagreement was: “On her visit of December 13, 1966, she stated that she has become very nervous and was having some misunderstanding about work with her boss.” Tr. 73. The misunderstanding was that her employer wanted her to return to work, but she had suffered too much pain on her two attempts to feel able to do so.