DOMENGEAUX, Judge.
Plaintiff-appellee Forest John Dugas was injured in an accident which occurred at the Sulphur Mines field in Calcasieu Parish on March 28, 1969. Made defendants are Leo Laughlin, his employer Southwest Construction Company, Inc. and Chicago Insurance Company as well as Lloyds *160 of London and Insurance Companies.[1] Chicago and Lloyds were the general liability insurers of Southwest Construction Company, Inc. and its employees. Intervening in the suit was Highlands Insurance Company, the workmen’s compensation insurer of Tiger Well Service, Inc. (plaintiff’s employer) for the payments which it made to plaintiff under the workmen’s compensation law for his injuries.
A jury trial was held resulting in a verdict in favor of plaintiff and against defendants, awarding him the sum of $45,000.00. The district court judgment recognized the intervention of Highlands Insurance Company and gave it judgment against plaintiff and the defendants in the sums paid out by it and for any further sums which it may pay to plaintiff as a result of this accident, all in accordance with LRS 23:1103.
Defendants have appealed suspensively to this court and plaintiff has answered the appeal praying that this court increase his award.
Appellants specify that the trial court erred in: 1) finding that the defendant Leo Laughlin was negligent and that his negligence was a proximate cause of the accident; 2) failing to find the plaintiff Forest John Dugas contributorily negligent; and 3) awarding a judgment in a grossly excessive amount.
The record discloses that the Sulphur Mines field, sometimes referred to as the Sulphur Wells, was being produced by Union Texas Production Corporation, and in that connection Tiger Well Service, Inc. was employed under contract by Union for the purpose of drilling and re-working sulphur wells. Plaintiff was a member of a Tiger crew, and was employed as a roughneck or floor hand. Tiger’s crew consisted of the driller Carl M. Moore, Alfred Moore, Gerald Rice, Larry J. Thibodeaux and plaintiff Dugas. In this work the Tiger company owned and furnished a portable drilling rig which was mounted to a large truck and also owned and furnished a large steel H beam which was some 16 feet long, 8 inches wide and weighed approximately 1,000 pounds. The beam was used as a foundation for the rig in the drilling and re-working processes. The beam is moved by a winch truck, and is lifted by a winch line which is attached to an eye paid in the center of the beam. When the beam is moved from one location to another, it is lifted and driven to the specified well location, where it is spotted. The Tiger company did not own a winch truck and when it was necessary to move the beam, a winch truck was furnished by defendant, Southwest Constuction Company, Inc., which was also doing work in the field for Union Texas Production Corporation. The winch truck which was being used at the time of the accident was manned by a crew of two people, the driver and operator, defendant Leo Laugh-lin, and a helper or swamper by the name of Peter Gervine.
The Tiger company had been working in the Sulphur Mines field for some years and the afore-described crew had been working together for as long as one and one-half years and all of the crewmen were experienced oilfield and sulphur field workers. The defendant Leo Laughlin had been employed by Southwest Construction Company, Inc. intermittently for some eight years and was classified as a roustabout or laborer. He was not a regular winch truck operator but had driven his company’s winch truck on two occasions prior to the accident and had transported the H beam in question from one location to another on one prior occasion. On the *161 day of the accident the Tiger crew, upon instruction of the Union Texas Production Corporation foreman, moved their drilling rig to well No. 57 for the purpose of reworking it. Independently, the defendant Leo Laughlin was instructed by someone from Union to pick up the H beam and move it to the well location which was to be worked over by the Tiger crew. The Tiger crew was awaiting the arrival of Laughlin with the H beam at the new location. A reading of the record indicates that moving from one well location to another within the field was a commonplace occurrence and that the Tiger crew worked on as many as four wells per day, but usually one or two, and in every instance it was necessary that the H beam be picked up and spotted to serve as a foundation for the rig. The record also shows that on these various moves the beam was moved sometimes by the Southwest Construction Company, Inc. winch truck and at other times by a winch truck owned by the pro-' ducer, Union Texas Production Corporation, and operated by its employees. It appears also from the testimony that the spotting of the beam on each new location was a rather stereotype procedure.
On the day in question the defendant Leo Laughlin backed the winch truck to the well location at an angle. The floor bed on the truck was about four feet from the ground. The beam had been hoisted to the top of the A frame on the winch truck to a position approximately five or six feet from the ground level. Laughlin operated the winch mechanism from inside the truck, with the left door open. As Laughlin began to lower the beam, the Tiger crewmen, with the plaintiff and Gerald Rice on one end and Larry J. Thibodeaux and Alfred Moore on the other, took hold of their respective ends of the beam to guide it into position. During the lowering operation the beam swung into plaintiff’s left ankle causing the injury he complains of herein. The testimony is conflicting as to the manner in which the accident occurred.
From the testimony of plaintiff and his co-workers, Larryr J. Thibodeaux and Gerald Rice, it is shown that as the beam was being lowered by defendant Laughlin the end which Thibodeaux was guiding became hooked or stuck to the corner of the floor bed of the winch truck and that when this occurred defendant Laughlin nevertheless continued the lowering process thereby causing the other end of the beam to hit the ground thus immobilizing the beam. Thibodeaux testified that at this point, after ascertaining that all hands were clear, he jerked his end from the truck bed, thinking that enough slack had been let out by Laughlin to assure that the beam would fall squarely and completely to the ground. Instead, the beam became suspended approximately eight inches from the ground, causing the other end to swing up, centering itself, and as it did, it struck plaintiff’s left leg. Defendant Laughlin denies that one end of the beam became lodged on the truck bed. He says he lowered the beam to a point where he was stopped by one of Tiger’s crewmen and that one of the Tiger crewmen then pushed down on the beam causing the other end to rise and as it swung it struck the plaintiff. Plaintiff and his witnesses deny that Laughlin was so stopped or signaled.
There was testimony, including that of one George Boudreaux who was qualified by the district judge as an expert in oilfield rigging and drilling operations, to the effect that in a situation where one end of a beam becomes stuck as allegedly occurred in this case, the end of the beam at the ground should have been held and the winch operator should have winched it back up to seek its level. Mr. Boudreaux also testified that when one end of a beam becomes attached or fixed to the truck bed the winch operator should stop and eliminate all slack in the winch line. Additionally it was shown that it is the duty of a swamper, such as defendant Southwest’s Peter Gervine, to direct the winch truck driver and to signal the driver when to pick up the beam or let it down. In this case, the swamper Gervine did not testify.
*162 During the aforementioned operation none of the persons who testified were absolutely sure as to the swamper Gervine’s position or location nor as to his activities in signaling or not signaling the winch operator.
Although there was no finding of fact by the jury in this case, its conclusion of fault on the part of defendant Laughlin is supported by the evidence. Obviously the jury believed the version of the accident as explained by plaintiff and his witnesses and concluded that Laughlin was at fault in continuing to let out slack after the beam became adhered to the truck bed. We find no manifest error in this conclusion. Of course, it may very well be that plaintiff’s co-employee Larry J. Thibo-deaux was also at fault in dislodging the beam as he did, but he was not made a party to this suit, and consequently we do not pass upon his liability.
Concerning plaintiff’s contributory negligence the evidence supports a finding that under the circumstances there was nothing plaintiff could have done to avoid being struck by the swinging beam. He was at one end of the beam as he should have been in this operation, and in view of the rather suddenness of the occurrence, he was unable to extricate himself from the path of the violently swinging beam.
At the time of the accident plaintiff was employed by Tiger Well Service, Inc. as a roughneck and was earning $154.00 per week. He was 47 years of age and had been working steadily in the oilfields for over 20 years. As a result of the accident he sustained a fracture of the end portion of the fibula on the left leg, associated with a separation of the joint of the leg bones and a loose ankle joint. The evidence establishes that plaintiff suffered excruciating pain initially and his left leg and ankle were injured to the extent that, as he was being transported to the hospital from the site of the accident, his foot flopped loosely due to the motion of the vehicle and it was necessary that one of the ambulance attendants hold the foot to prevent its misalignment with the lower portion of the leg. He was hospitalized for 17 days during which time surgery was performed and a large screw was inserted through the fractured leg. A cast was applied to his leg from the knee down to the foot. After he was released from the hospital he was confined to his bed until the latter part of July, 1969 at which time the cast was removed. It was necessary that he use crutches for approximately six weeks thereafter. In August, 1970 the screw was removed from his leg by surgical procedure. Plaintiff’s treating physician was Dr. Jerome W. Ambrister who, for some unexplained reason, of which no issue is made, did not testify. Dr. Norman P. Morin, an orthopedic surgeon examined plaintiff on three occasions, March 25, 1970, which was approximately one year after the accident, again on October 6, 1970 and finally on March 15, 1971. The first two examinations were at the request of plaintiff and the last at the request of defendants. Dr. Morin was the only physician who testified, and he was called by the plaintiff. Dr. Morin had x-rays made of plaintiff’s left leg and described plaintiff’s injury as being very severe. The ligaments had been completely torn and some of the nerves around the injured area had to be cut during the operating procedure. The fracture healed as well as was possible under the circumstances. There were several scars at the site of the injury including one scar over four inches long from the initial surgery. Plaintiff limped as a result of the injury. Dr. Morin was of the opinion that plaintiff could expect some degree of permanent pain in his ankle depending upon his activity. He opined that further surgery would not alleviate plaintiff’s disability or pain and that the ankle would get worse rather than better with time. Dr. Morin was of the opinion that plaintiff suffered a 35% permanent partial disability of the left foot and ankle and that plaintiff was permanently disabled from working in the oilfields or any type of similar strenuous' employment. In re *163 sponse to questions by plaintiff’s counsel Dr. Morin said:
“Q Doctor, I think you related previously that it was your opinion that Mr. Dugas would not be able to return to work involving considerable walking or walking on irregular surfaces, or climbing, without substantial pain, is that correct?
A That is correct.
Q And would such activities cause added difficulties with the ankle and lay him up in bed, so to speak?
A Very much so. It would be a matter of degrees, which will gradually increase. For instance, I think that if this individual for financial reasons made up his mind and said, I am going to take this pain, and I will return to the work of a roughneck, he might with — excuse the expression — lots of guts go through it, let’s say, for several weeks on end, maybe three, four, five, up to eight weeks, then the pain will get the best of him, and he will have to lay low for quite awhile, and if he would return again, with each recurring attack of pain you would irritate the joint enough that arthritic changes would develop and that ligament would finally give out completely whereby he might end up by having to have the ankle stiffened surgically. So although an individual could possibly return to work, I feel as an orthopedic surgeon that this would be detrimental to his health and to the well being of his ankle.”
Plaintiff performed no work until February 6, 1971, some 23 months after the accident, when he went to work for Bond Oil Company. The owner of the oil company, which is a bulk distributor for oil and gas products, also operates a service station. He is a friend of plaintiff and knew of his disability when he hired him. In his employment plaintiff performs no heavy labor and does no extensive walking. He works in the service station waiting on customers and on occasion performs tire repairs. He also delivers bulk gasoline by truck to his employer’s customers. A short time before the trial of this matter on May 20, 1971 plaintiff obtained a part-time job as a school bus driver. After he completes his school runs in the mornings and afternoons he returns to his work with the oil company. The deliveries of gas and oil which he makes are, as a general rule, to farmers in the rural area. When he is not delivering those products he is working in the service station. None of his present employment entails strenuous work nor does it require extensive walking or any climbing. He is paid $75.00 per week by the oil company and $320.00 per month for driving the school bus which is limited to nine months per year. Overall he earns less now than when he worked in the oilfields.
He limps and suffers a rather constant mild pain in his left leg which becomes severe with any heavy work or extensive walking. The situation will get no better.
Considering the approximately $15,000.00 which he lost in wages during the twenty-three months following his accident, as well as the reduction of his earning capacity now and in the future, and his pain, suffering and disability in addition to $1,534.54 in medical expenses, we cannot say that the trial jury erred in awarding plaintiff the sum of $45,000.00 with legal interest, the award being neither excessive nor inadequate. Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149; Lomenick v. Schoeffler, 250 La. 959, 200 So.2d 127; Miller v. Thomas, 258 La. 285, 246 So.2d 16.
Accordingly the judgment of the district court is affirmed at appellants’ costs.
Affirmed.

. The syndicate comprising Lloyds of London and Insurance Companies in this action is composed of Jack Norman Cres-well, individually and on behalf of Lloyds, Excess Insurance Company Limited, British National Insurance Company, World Auxiliary Insurance Company, Ltd., English & American Insurance Company, Ltd., A1 Ahloia Insurance Company S.A.K., and Bermuda Fire & Marine Insurance Company Ltd.