DOMENGEAUX, Judge.
This suit arises out of an automobile accident which occurred on July 14, 1972, between a vehicle owned by the plaintiff, being driven by Mrs. Mary C. Webster, and another vehicle, owned by the defendant, Victor A. Leblanc, and driven by his son. Andre. Co-defendant is Leblanc’s automobile liability insurer, United Services Automobile Association. Plaintiff sued for damages on behalf of his minor son who was a passenger in the Martin vehicle and individually in his own name for medical expenses, loss of wages, automobile rental bills, etc. incurred as a result of the accident. Defendants did not contest their sole negligence as being the cause of the accident. After a trial on the merits, the district court granted judgment in favor of the plaintiff in the sum of $500.00 for car rental services and an award of $300.00 for and on behalf of plaintiff’s minor son, James Martin, for the injuries he incurred. All other demands were rejected and plaintiff has appealed. Defendants *275 have neither appealed nor answered this appeal.
The facts of this case are as follows: On July 14th Mike Martin, Jr. and his two sons were at a “swimming hole” on Deer Creek in Beauregard Parish when the yoimger son James apparently lost his balance and fell, sliding down the bank of the creek a distance of some six or eight feet. In the process of sliding down the slippery incline on his posterior, while attempting to brace himself with his hands, James sustained an injury to his left arm. The plaintiff, after assisting the boy back to the top of the bank and examining the injured arm, found abnormal swelling and a knot protruding on the top of the arm below the elbow. The child complained that the injury was very painful and, although the plaintiff thought at the time that it was a simple dislocation, he decided to take James to a doctor. However, the plaintiff’s truck bogged down on the way home and Mrs. Mary Webster, the soon-to-be wife of the plaintiff, volunteered to take James to the doctor in DeRidder. Accordingly, Mrs. Webster started out driving toward De-Ridder with James in the back seat of the Martin automobile.
At approximately 5 P.M. on Highway 26, approximately six miles east of De-Ridder, the Martin vehicle collided with a Volkswagen driven by the defendant’s son. The collision occurred when Andre Leblanc, as he was approaching a sharp curve, lost control of his vehicle and swerved into the lane of traffic which the Martin vehicle was travelling.
Twelve year old James testified he saw that the accident was going to happen so he sat up straight bracing himself by leaning back and putting his feet on the floorboard of the automobile. He further stated that upon impact he hit the back of the front seat with his whole body and was thrown to the floor where be became nauseated and commenced to vomit. It was also his testimony that after the accident his arm was no different than before except for numbness in the vicinity of the elbow and that it became more comfortable to hold the arm in a different position than prior to the collision.
The plaintiff received word of the accident shortly after its occurrence and arrived at the scene almost immediately. He testified that when he arrived his son’s arm was twisted at an awkward angle different from the position it had been in when he got into the car to leave for the doctor. He further stated that there were bruises not present before the automobile accident. Besides those on his son’s knees and on the side of his face there allegedly was one on the lower left forearm and another round bluish bruise just above the elbow. Although the accident had just occurred it was also plaintiff’s testimony that the bruises were already discolored and bluish streaks could be seen in the bruised area.
Shortly thereafter James was transported to Beauregard Memorial Baptist Hospital and was examined and treated in the emergency room by Dr. E. R. Brown, a general practitioner. Doctor Brown stated that from the information and history given to him by James and Mrs. Webster, as well as his examination, it was his impression that the arm had been fractured in the fall at the swimming hole. He further testified that there was nothing to lead him to believe that, instead, the arm was fractured in the automobile accident or that the injury to the arm had been affected or aggravated in any way by it. Nor did James and Mrs. Webster suggest this in their discussions with the doctor concerning both accidents.
Doctor Brown found upon examination a severe supracondylar fracture of the left arm above the elbow which was displaced, producing a lump with a considerable amount of deformity and swelling. In addition he found very minor injuries in the *276 realm of abrasions, contusions, and scratches which he felt would have probably healed in a week or so.
James was thereafter hospitalized for several days and Doctor Brown attempted closed reduction surgery on the arm and placed it in a cast. The operation turned out unsuccessful and James was referred to a Lake Charles orthopaedist, Doctor Phillips, who was not called to testify at trial or in deposition. Surgery was performed on the elbow which was pinned together and James has subsequently recovered with no trouble since.
Plaintiff alleges that as a result of the accident he missed a week of work as an offshore boat captain and is entitled to reimbursement. In addition, as testified to by the automobile dealership which repaired plaintiff’s automobile, an adjuster and representative of defendant’s insurer, Mr. Montrose, arranged for plaintiff to be rented a vehicle while his was being fixed. All discussions in reference to said rental were' between the insurer’s representative and the dealer. Due to the unavailability of automobile parts, repair of plaintiff’s vehicle took a longer period than expected and plaintiff kept the rented automobile for 57 days, running up an adjusted bill of $500.00. However, when the bill was presented to the defendant-insurer a dispute apparently arose as to who was responsible for payment. The defendant-insurer’s adjuster, Mr. Montrose, although in court when the case was tried, did not testify on behalf of the insurer and, as aforementioned, plaintiff was granted in the judgment an award of $500.00 to pay the automobile rental bill.
On this appeal plaintiff cites the following specifications of error on the part of the trial court:
(1) in failing to find that the automobile accident aggravated the pre-existing injury of plaintiff’s minor son;
(2) in failing to grant plaintiff’s son an adequate amount for the injuries he received as a result of the accident;
(3) in failing to award plaintiff individually a portion of the medical bills which were incurred on behalf of his minor son as a result of the accident.
The only physician to testify in this suit was Dr. E. R. Brown. His testimony is very clear and to the effect that in his opinion plaintiff’s severe fracture was consistent with his described fall at the “swimming hole” and that such a fracture would normally displace the elbow as indicated by the testimony of Mr. Martin.
On the question of aggravation of the pre-existing injury by the later accident, as well as James’ other complaints, we feel it appropriate to quote at length the following excerpts from Doctor Brown’s testimony:
“Q. Let us assume that the young boy is in the back seat of this
[Dep. 13] car and this was almost a head-on collision and it’s estimated that this other vehicle was going about 45 miles an hour and the young boy is behind the mother holding his left arm, and
[Dep. 14] let us further assume that there is some evidence that the back seat was indented, that the force of the impact caused him to go forward, striking the back seat with his arm and other parts of his body. Would that in any way affect your opinion to the effect that this arm could have been aggravated by this particular automobile accident ?
A. I don’t think so because the man only had one fracture, and when you have an aggravation, it’s pretty difficult to aggravate a fracture that’s already there. A supracondylar is a fracture that involves the humerus. There’s no way of aggra *277 vating the thing that’s already broken unless you would puncture the skin or some other thing. Another thing, there weren’t any bruises. Apparently, he was protecting this and hit the back of this with his other shoulder or his other arm or something else because there were no abrasions on the arm that indicated another blow as far as I can remember.
Q. Do your notes reveal any abrasions or contusions on the upper forearm or lower forearm? Black and blue marks or any — ■
[Dep. IS]
A. No.

Q-Is it possible that this fracture or injury in this right elbow
[Dep. 16] could have been aggravated in this automobile collision if it struck the seat?
A. I don’t think — of course, if it would have struck the seat, an aggravation would have been in what form? There was no evidence of any trauma outside of the elbow that I could see and the fracture was already present, and it was a simple type of supracondylar fracture so I don’t know of what type of aggravation you really could get unless, as I said before, unless you would force — if you would have had additional trauma the type you were talking about with a broken bone displaced and sticking out, it would have stuck through the skin. There was no break in the skin.
Q. Now if the young boy said that after the accident he was vomiting, would that have any — what would be the cause of vomiting?
A. Well, of course, vomiting can be an emotional thing or can be caused by pain or trauma or fear or any of those things. I
[Dep. 17] don’t think it necessarily had anything to do with the accident other than the fact that it was a double experience at one time. He already had a broken arm and being involved in an accident—
Q-The boy’s testimony was taken this afternoon, and he mentioned something about when he was in the car his left arm was in such a position as — hands down so to speak. He was resting it on the other arm. And I believe his testimony was that after the accident he was on the floor of the car and his arm was twisted a little bit in one direction, and he said it was more comfortable after the accident to have his arm that way instead of palms down and that there was numbness that he experienced first after the accident. Would that be of any significance medically?
A. Well, I don’t think so. The fracture was above the elbow and, of course, the rotation that he talks about occurred below the elbow with your radius and ulna. Your radial ball moves. So I don’t think that that would be significant other than the fact I’m sure that he was jarred real hard and stirred up and
[Dep. 18] that type of thing. I don’t think that it affected the injury from that standpoint.
*278 Q. Would a jarring- or shaking up of that arm and moving it in the direction, say, it did strike that seat in any way make the condition worse than it was originally ?
A. I don’t think so. Like I said, the jarring injury that causes rotation, your rotation movement is all below the elbow. It involves the ball of the radius. That’s what we call abduction and adduction.
Q. Medically speaking, would it be possible to make the injury more severe by having this second blow at it so to speak?
A. I think it would be possible if you could have enough injury to, like I said, displace the bone to the extent that it would puncture the skin and compound the fracture. He already had a comminuted fracture which is a fracture that involves a double break but a compound is a different thing. That’s when it breaks through the skin and that could have happened' but it didn’t as far as I know.
Q. You said this was a compound fracture?
A. No. It was not a compound fracture. It was comminuted.”
From the foregoing the trial court concluded that plaintiff failed to carry the burden of proof to establish that the fracture of the arm was either caused or aggravated by the automobile accident. It was the district judge’s opinion that the statements made by plaintiff and his son gave rise only to the possibility or conjecture that the collision caused or was related to the supracondylar fracture and that a determination of the issues had to be based upon the medical evidence before the court. That testimony led the court to conclude that the fracture was sustained in the fall at the swimming hole and that said fracture was not subsequently aggravated or otherwise affected by the automobile accident. Following this conclusion it was also determined by the trial judge, that all of the medical bills filed into evidence were incurred directly in connection with and in relation to the fracture. There was no indication of any charges attributable to the relatively minor bruises and abrasions sustained by James, all of which seemed to have healed in the natural course of things within a matter of two or three weeks at the most. Likewise the loss of wages was found to be in connection with the fracture of the arm and therefore rejected.
From our close examination of the record and testimony therein we find no manifest error in these findings of the trial judge.
Thus, the only question remaining is the amount awarded to the plaintiff on behalf of his son for the injuries received in the accident, apart from the fracture incurred at the “swimming hole”. Plaintiff alleges in his original petition that in addition to contusions and abrasions his son sustained injury to nerves, muscles, and ligaments of his legs, knees, right arm and back. This is completely unsubstantiated by any testimony. The only testimony in regard to James Martin’s other injuries is, as aforementioned, that of the examining physician, Doctor Brown, in the emergency room. He found only abrasions and bruises upon plaintiff’s knees, which he felt would have healed in a couple of weeks.
Much discretion is granted to the trial judge on the question of the amount to be awarded for damages. Miller v. Thomas, 258 La. 285, 246 So.2d 16 (1971); Lomenick v. Schoeffler, 250 La. 959, 200 So.2d 127 (1967); Ballard v. National In *279 demnity Co. of Omaha, Nebraska, 246 La. 963, 169 So.2d 64 (1964); Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963).
We are of the opinion that the award in this case is not an abuse of said discretion.
For the above and foregoing reasons the judgment of the trial court is affirmed at plaintiff-appellant’s cost.
Affirmed.