SAMUEL, Judge.
The sole issue before us is the quantum of a jury award for damages resulting from a rear end collision. Plaintiff was awarded $2,000 for personal injuries and $96,000 for past and future loss of income.[1] Both litigants have appealed. While not questioning the award for loss of wages, plaintiff contends the award for personal injuries is inadequate. Defendant does not contest the award for personal injuries, but contends the award for loss of income is excessive.

The Injury

Testimony pertinent to personal injuries was given by plaintiff, his wife, and the following medical experts: Dr. Philip Rabi-to, plaintiff’s family physician, Dr. Stuart Phillips, an orthopedic surgeon, who testified on behalf of plaintiff, and Drs. Harold Stokes and G. Gernon Brown, orthopedic surgeons who testified on behalf of defendant.
Plaintiff, who was 55 at the time of trial, testified: On May 10, 1976, while stopped for a light on South Claiborne Avenue near the Poydras off ramp in the City of New Orleans, his vehicle was struck from behind by a defendant bus. His head snapped back and his face was turned up to the roof of the car. He was stunned and felt pain in the neck from the base of the skull to the shoulders, upper back and right arm. He went from the scene to a hospital emergency room, where x-rays were taken. He was advised to consult his personal physician. That afternoon he saw Dr. Rabito who treated him. The therapy helped and he improved under the doctor’s care. He was out of work from the date of the accident until some time the following month.
In the middle of August he had a flareup. He did not return to Dr. Rabito but went to Dr. Phillips, a surgeon recommended by his attorney. Dr. Phillips treated him thereafter.
Plaintiff’s principal employment was with the Community Improvement Agency, for whom he makes construction inspections of residential property and evaluations and recommendations for repairs. In addition to his principal job he is a self-employed construction contractor on evenings and weekends.
At the time of trial he complained of stiffness in his neck, right arm and shoulder. He was discharged from the Community Improvement job but the discharge was not related to the accident.[2] He had appealed the decision to the Civil Service Commission, which upheld the agency, and the matter is now on appeal in the courts. Plaintiff would like to return to his job with the agency and feels he could manage the work, but he could not do full time construction work. He has not sought other employment, awaiting the outcome of his suit for reinstatement.
Mrs. Wall testified that after the accident her husband seemed to be in constant pain and is restless at night. He goes to work but comes home in distress, uses traction regularly and rests frequently.
Dr. Rabito testified he saw plaintiff on the date of the accident, took a history and performed an examination based on plaintiff’s complaints of soreness in the upper and lower cervical and dorsal areas. Muscle tenderness and spasm were found. The doctor concluded plaintiff had a cervical strain. Treatment consisted of analgesic compound, muscle relaxants, moist heat applications. He was seen again May 14, 21, 28, and was discharged on May 28. He had received ten ultrasound and wet pack treatments. The doctor concluded plaintiff had received maximum benefits from treatment *82 and would continue to improve. There was no evidence of a nerve or disc injury and residual impairment was not anticipated.
The next physician to see plaintiff was Dr. Stokes, defendant’s orthopedic specialist, who examined him on August 3, 1976. Plaintiff stated he was much improved but still had soreness in the neck, back and right shoulder. He denied numbness or tingling in the arms and legs. No muscle spasm was noted and there was normal range of motion with no apparent discomfort. At this time there was no evidence of a serious disorder or clinical evidence of nerve root compression or irritation; the patient was back at work and his symptoms were subsiding. The doctor concluded plaintiff may have sustained a cervical and dorsal spine strain as a result of the accident.
Plaintiff was next seen by Dr. Stuart Phillips, who testified: He first saw plaintiff on October 19, 1976 (five months after the accident). He took a history and performed a routine orthopedic examination. At that time plaintiff complained of low level pain in his neck, radiating into his right arm. The doctor associated this with paresthesia, i. e., if a nerve is injured numbness and tingling are noted. Plaintiff stated his symptoms were worse with activity and better with rest. The doctor considered this important because it is typical of a ruptured disc, which he felt plaintiff had. No muscle spasm or muscle weakness was noted, but there was a decrease in the right tricep reflexes as compared to the left. X-rays of the cervical spine taken at this time showed a straightening of the cervical curve.
The doctor diagnosed plaintiff’s injuries resulting from the accident as an injury to the nerve between the sixth and seventh cervical vertebrae. The symptoms are common (intermittent pain, worse with activity, radiating to the arm, and pain associated with numbness and tingling) in a patient with an irritated nerve in the neck from a ruptured disc. He concluded Dr. Rábito had treated the patient properly because the symptoms were low grade and were not exacerbated when he was seen.
Plaintiff was next seen by Dr. Phillips on November 16, at which time he was placed on cervical traction at home. When seen on December 4, plaintiff was almost well. However, he returned January 14, 1977 with complaints of pain radiating into his arm, but no neck complaints. Increased activity was recommended. On February 25, plaintiff had a normal examination and complained of only occasional symptoms. He was ordered to discontinue traction and increase his activities.
On March 25, following the discontinuation of traction, plaintiff’s symptoms returned. The doctor noted spasm and limitation of the neck along with absent reflex. Plaintiff stated he had good and bad days, which is compatible with a ruptured disc.
On November 22, 1978 plaintiff returned to be checked. He said he experienced intermittent pain in his neck and right shoulder. Some spasm and limitation were noted. The doctor concluded plaintiff could learn to live with the problem and therefore did not advise surgery. Initially he was of the opinion plaintiff had a sprain while under Dr. Rabito’s care, but instead of healing, it progressed to a disc injury. The difference in symptoms between a cervical sprain and a ruptured disc is determined by the presence or absence of evidence of nerve injury. The fact that plaintiff had pain running into his arm indicated the pain was due to an irritated nerve in his back.
Dr. Phillips testified if he had seen plaintiff on only one occasion he might have made a diagnosis of sprain, but he was able to see him on a continuing basis, and thus concluded plaintiff had a ruptured disc.
When last seen May 3, 1979 plaintiff still had intermittent symptoms and pain radiating into his right arm. The doctor measured plaintiff’s arms and found the right arm smaller than the left arm, which is distinctly abnormal for working people. He had spasm, limited motion of the neck and muscle atrophy in his arm. Atrophy is caused by disuse. When something hurts we don’t use it, or if it is paralyzed we can’t use it.
*83 The long term treatment is continued use of traction. Plaintiff could return to work but not on a continuous basis because his pains are intermittent and relieved by rest. The doctor stated plaintiff could work as a housing inspector. However, if he has to move his neck to look up for long periods and be active his symptoms will recur and at that point the best treatment is traction and rest. If plaintiff works as a paperhanger, carpenter and painter on a 40 hour per week basis he will have pain intermittently. He has learned to live with it and surgery is a real risk the doctor usually reserves for patients who are in greater distress.
Dr. Gernon Brown examined plaintiff on two occasions, January 26,1977 and May 17, 1979. Plaintiff complained of intermittent trouble with his neck and a history of pain in the upper right extremity. X-rays were requested, but the patient refused so the doctor reviewed the prior x-rays taken by Dr. Phillips. He found no fracture or dislocation, or objective evidence of any injury, but based upon the history the doctor concluded plaintiff had sustained strain in the cervical spine. There was no clinical evidence of a herniated intervertebral disc, or evidence of a preexisting condition and the doctor felt plaintiff could perform his former duties. He was under the impression plaintiff was working at the time of this examination.
On May 17,1979 plaintiff still complained of trouble with his neck, tingling in the right hand, numbness in the big toe and back problems. The doctor concluded plaintiff could do any work he had previously done including carpentry and paperhanging.
Thus, with the exception of Dr. Phillips, all of the other doctors concluded plaintiff sustained a cervical and dorsal strain related to the accident but of brief duration.

Loss of Income

At the time of the accident plaintiff was employed by the Community Improvement Agency as an inspector. His duties involved making construction inspections of residential property and evaluations and recommendations for repairs. He uses measuring devices, flashlights and ice picks to make a complete inspection from the roof down or the ground up. Following such inspections he returns to his office and makes a written report on a room to room basis, including recommendations and cost analysis. His earnings from this job amounted to $11,830.29 in 1975 and $12,-095.64 in 1976 (the year of the accident), and from January 1 through April 15, 1977, when he was laid off for reasons unconnected with this accident, he earned $4,065.37.
In addition to his principal job plaintiff was a self-employed contractor on evenings and weekends. In 1975 he earned a profit of $943 from self-employment, $1,044 in 1976, $1,479 in 1977 and $1,050 in 1978.
Plaintiff was dismissed from Community Improvement on April 15, 1977 for unsatisfactory service relative to failure to keep appointments, absence without approved leave, and unsatisfactory service on March 31, 1976 and March 30, 1977. (The specific charges for the unsatisfactory ratings were detailed in both instances.)
We note in 1975 (preceding this accident) his employer indicated plaintiff’s assignments were not completed timely, his work was careless, he had a negative attitude toward his supervisor and project officer, he failed to follow orders, failed to properly document his time out of the office, and failed to keep appointments with clients.
Dr. Seymour Goodman, an economist, testified relative to loss of wages. He assigned plaintiff a 10.7 year work-life expectancy. He stated past wage loss from date of injury to date of trial, after allowing for taxes, would be $24,609[3] and that future loss of wages, after discounting and allowing for deduction for taxes, would be $70,637.54.
The computation of future lost wages was based upon the difference between the minimum wage and plaintiff’s wages with Community Improvement after applying *84 the inflation rate to the CIA wage, and predicted increases in the minimum wage rate, applying the income tax rates to these projected differences and reducing that figure to present value.
The jury apparently accepted the figure of $70,637.54 for future loss of wages, adding that to past loss of wages of $24,609, which gave a total of $95,246.54. It rounded this figure to $96,000, which they awarded for loss of wages.

Conclusion

The two jury awards are difficult to understand. It could have believed plaintiff had a ruptured cervical disc, as found by Dr. Phillips, especially in view of the fact that Dr. Phillips was the treating physician and a specialist in the same field as were defendant’s medical witnesses. This could account for the $96,000 award for loss of income since that doctor concluded plaintiff would have intermittent, but low grade, pain in active employment. However, if Dr. Phillips’ testimony is accepted, the $2,000 award for pain and suffering is manifestly inadequate. On the other hand, if the jury believed plaintiff had sustained only a minor cervical sprain, as testified by the defendant’s doctors, the $2,000 award for pain and suffering would be adequate and the $96,000 award for loss of income would be manifestly excessive.
We find merit in the contentions of both parties. In our view, and we feel this requires no further discussion, the award for pain and suffering is manifestly inadequate. And, because of the fact that the plaintiff himself testified he is presently able to perform the work in which he was engaged at the time of the accident, with which his treating physician, Dr. Phillips, agrees, and the fact that he can also perform his prior contracting business, a large part of which he subcontracted to others, we conclude the award for loss of income is manifestly excessive. However, within the limits of our permissible review under the guidelines set by the Supreme Court of Louisiana,[4] the total amount of $98,000 is neither excessive nor inadequate. Accordingly, we affirm.[5]
For the reasons assigned, the judgment appealed from is affirmed.
AFFIRMED.

. The judgment also awarded plaintiff $350 property damage and $800 medical expenses.

. He had several unsatisfactory ratings prior to the accident.

. However, plaintiff was not off work the entire time from the date of accident to date of trial.

. See Reck v. Stevens, La., 373 So.2d 498; Lomenick v. Schoeffler, 250 La. 959, 200 So.2d 127; Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149.

. See Harris v. D'Antoni, La.App., 355 So.2d 1049.