DOMENGEAUX, Judge.
This litigation in tort arises out of a vehicular accident which occurred on November 23, 1966, at the intersection of Louisiana Highways 88 and 3052, in Iberia Parish, Louisiana.
At that point Highway 3052, a new four lane divided highway, runs generally north to south while Highway 88 runs generally east to west. Highway 3052 was closed to traffic south of its intersection with Highway 88 and accordingly one travelling south on Highway 3052 would be confronted with a number of signs warning of its termination. These included two signs located on either side of the southbound lanes some 1,500 feet from the intersection and reading, All Traffic Exit 1500 Feet; two Stop Ahead signs similarly situated, but at a distance of 700 to 1,000 feet from the intersection; and two Stop signs located just on the north side of the intersection. In addition, on the south side of the intersection, there were two barricades, one in each lane, bearing signs saying Road Closed. Such barricades, we gather, were normally also present on both of the northbound lanes of 3052 at their junction with the south side of the intersection, but on the day in question only one of the northbound lanes was so barricaded. The speed limit on Highway 88 at that point was 60 miles per hour, and there was nothing to impede the flow of traffic, on that highway, through the intersection.
In spite of the fact that all four lanes of Highway 3052 were closed south of the intersection with Highway 88, those lanes were used by local traffic as well as by those engaged in the construction of Highway 3052 as it progressed south of the intersection. In this latter category was one Freddie Koury, who together with his employer, Doug Ashy Sand & Gravel, Inc., and its insuror, State Farm Mutual Automobile Insurance Company, was made defendant and ultimately cast in judgment.
Koury was the driver of a truck pulling a dump type trailer, and was engaged in hauling sand from a point several miles north of the intersection to a point approximately one mile south thereof. His route was on Highway 3052 whereon he would drive south to the intersection with Highway 88, go around the barricades, and continue south on the unopened portion of Highway 3052. To return he followed the same procedure in reverse order. He had completed six round trips on the day in question, and was returning from his seventh delivery, thus he had crossed the intersection thirteen times. Additionally, he had previously operated his truck on that same route.
Plaintiff, a salesman working for a wholesale grocery dealer, was driving his automobile in an easterly direction on Highway 88. As he approached the intersection he was following a white Ford automobile, driven by Mrs. Douglas Boutte, at a distance of from three to five car lengths. He was travelling at thirty to forty miles per hour, and watching the *232 Boutte automobile as the latter’s tail lights were on, indicating to him that the driver was about to change her course. As plaintiff crossed the northbound lanes of Highway 3052, defendant’s truck entered the intersection at an approximate speed of forty miles per hour and struck the right side of plaintiff’s automobile.
As a result of the collision plaintiff suffered serious injuries for which he sued the Louisiana Department of Highways and the above named defendants, together with several other parties no longer in the suit and therefore irrelevant to our discussion. After a trial on the merits judgment was rendered in favor of plaintiff and against Koury, Doug Ashy Sand & Gravel, Inc., and State Farm in the sum of $80,000.00. The Department of Highways was found to be free from negligence. We have before us an appeal by the three cast defendants seeking a reversal of that judgment, or in the alternative, a reduction thereof. Plaintiff answered the appeal asking that the damages awarded be increased.
In the trial court’s written reasons for judgment we find the following opening remarks:
It is so obvious from the facts in this case that the tort herein sued upon was caused by the negligence of the driver of the truck involved that only a limited amount of discussion of the facts is necessary.
We are inclined to agree with our learned brother of the district court.
As shown above, the markings put on Highway 3052 by the Highway Department clearly indicated that it was closed south of its intersection with Highway 88, and that traffic moving on the latter had the right of way. Defendant Koury was well aware of these conditions, as he had crossed the intersection numerous times, and had approached it from both north and south on Highway 3052, thus being exposed to all of the warning signs. Nevertheless, he saw fit to approach the intersection at a speed of forty miles per hour and, as he himself testified, with no intention of stopping. Clearly this constituted negligence on his part.
Koury testified that as he neared the intersection he saw Mrs. Boutte’s automobile, and that when he noticed her, he blew his air horn and applied his brakes. Mrs. Boute passed safely but the plaintiff’s vehicle, which Koury never saw until the impact, was struck.
Mrs. Boutte, together with a number of witnesses who were in the immediate area at the time of the accident, testified that she never heard either a horn sounding or the screeching of brakes. The trial judge was therefore not in error in rejecting Koury’s testimony regarding his efforts to avoid the accident, and we consider his continuing negligence to have been the proximate cause thereof.
Plaintiff was, as aforesaid, driving at a moderate rate of speed on the right-of-way road. He customarily passed through the intersection on a weekly basis in the course of his employment. Thus he knew that Highway 3052 was closed south of its intersection with Highway 88, and he stated that on the previous occasions he had never seen a vehicle exit from behind the barricades on the south side of Highway 88, although there is some evidence that he had previously seen vehicles moving in that area. Additionally, just before the collision he was concentrating on Mrs. Boutte’s automobile as her brake lights were on. Under these circumstances we are constrained to concur with the trial court's finding that plaintiff was not con-tributorily negligent in failing to see the defendants’ truck. In any event, even had he seen the truck, he would have had every right to believe that it would stop, as it was approaching a favored, open highway. Thus, his failure to see the truck was not negligence, and if it were, it would not, insofar as the facts before us indicate, be a proximate cause of the accident. Accord *233 ingly, Koury’s negligence being the sole proximate cause of the accident, plaintiff is entitled to recover from him, his employer, and its liability insurer.
The Highway Department was properly absolved of negligence, as all of the evidence indicates that the nature of the intersection was made well known to motorists in the area by the signs put in the vicinity by the Department. Further, all of the testimony indicates that those signs and barricades were maintained in a diligent manner.
Turning now to the issue of quantum, we note that prior to the accident plaintiff, who was 32 years of age, was in excellent health and an extremely active man. He had been working as a salesman for a wholesale grocery dealer for the past several years, and his duties as such required him to drive some 500 miles per week, calling on customers and taking their orders. At home he went considerably beyond the usual tasks performed by the average homeowner, having added a bedroom, bath, and den to the original edifice. In doing these projects he did his own plumbing and electrical work, besides the more basic construction.
Immediately after the collision, on November 23, 1966, plaintiff was unconscious and, to at least biie witness, appeared to be deceased. He was taken by ambulance to Dauterive’s Hospital in New Iberia, Louisiana, where he was seen in the emergency room by Dr. George Douglas Sagrera.
Dr. Sagrera found plaintiff to have a large bruise over his right lower leg, lacerations of the left shoulder and left hand, and hematoma of the neck and the right parietal part of his head. Additionally, plaintiff was disoriented and remained so for several days. The doctor sutured his lacerations, gave him medication for his pain, and hospitalized him. Thereafter, plaintiff was treated with muscle relaxants and pain medication until his discharge from the hospital on December 2, 1966. During that time plaintiff was in severe pain and suffered from partial amnesia and loss of hearing.
After his release from the hospital plaintiff was treated on a regular basis by Dr. Sagrera with muscle relaxants, pain medication, and steroid anesthesia injections in the right knee area. With time the amnesia and loss of hearing improved, but the pain in plaintiff’s right leg became worse and he developed a limp. Dr. Sagrera referred plaintiff to an orthopaedic specialist, Dr. James Gilly of Lafayette, Louisiana, who examined plaintiff on September 11, 1967, and found evidence that was suggestive but not conclusive of a disc rupture at the L-4 — L-5 area. Dr. Gilly recommended that plaintiff consult a neurosurgeon.
On September 21, 1967, plaintiff consulted Dr. John D. Jackson, a New Orleans neurosurgeon. Dr. Jackson examined plaintiff and reviewed the x-rays that the latter presented to him. He concluded that plaintiff possibly had an irritated nerve root, as he continued to complain of pain in the low back and right lower extremity, but he thought that with a little more time there was a chance that the condition would correct itself. The story was much the same on February 29, 1968, when the doctor again examined plaintiff, except that there was an area of decreased sensation of the lateral aspect and heel of the right foot.
On October 21, 1968, Dr. Jackson saw plaintiff again, with continued complaints of low back and right leg pain. This time he performed a myelogram which revealed suspicious but not conclusive evidence of a degenerated disc at the L-^t-5 level. Because of those findings and to obtain a more definite diagnosis, a lumbar disco-gram was performed on October 23, 1968. This demonstrated that the L-5 disc was ruptured and the L-4 disc was degenerated, and plaintiff was advised to have these removed from the right side. As a result *234 of these tests, painful in themselves, plaintiff suffered severe headaches for a period of some two weeks.
The pain grew worse and on January 14, 1969, plaintiff underwent surgery for the removal of the L-4 and L-S discs on the right side. It was found during surgery that those discs were in fact compressing the nerve roots. The result was that the pain in plaintiffs leg disappeared, and on March 6, 1969, the next time he visited Dr. Jackson, he was advised to return to light work, preferably at a desk job.
Plaintiff continued to see Dr. Jackson intermittently, with increasing complaints of low back pain. The doctor recommended first a canvas type brace and, when that failed to afford relief, he put plaintiff in a metal brace. The latter seemed to relieve his symptoms, indicating to the doctor that perhaps plaintiff would obtain relief from a fusion of his vertebrae. In late August 1970 another myelo-gram was performed which indicated an anterior defect in the L-3 disc and additionally at the L-4 disc.
On September 27, 1970, plaintiff was admitted to Oschner Foundation Hospital for surgery involving the above referred to fusion. During the operation it was confirmed that the L-3 disc was also degenerated and it was removed. Dowels of bone were removed from plaintiff’s ilium and these were wedged between the vertebrae at the L-3-4, L-4 — 5, and L-5-S1 levels, in place of the discs that had been removed. The operation, termed a posterior lumbar interbody fusion, was accompanied by blood transfusions, potent pain killing drugs, and inhalation therapy, which in plaintiff’s case, produced nausea.
Plaintiff was released from the hospital on October 5, 1970, in a back brace, and six months later, on March 22, 1971, stress x-rays were made of his spine. These showed no motion between the fifth lumbar vertebra and the first sacral vertebra; a millimeter of motion between the fifth lumbar vertebra and the fourth lumbar vertebra; and twenty-five per cent motion between the fourth lumbar vertebra and the third lumbar vertebra. The object of the operation was, of course, to eliminate motion, as it is motion that produces pain. The procedure, then, was not entirely successful, and the probability is that the bone will not fuse anymore than it has.
Dr. Gilly, who re-examined plaintiff on March 24, 1971, and was being presented the stress x-rays, opined that the bone grafts were being absorbed rather than fused. Further he thought that the motion showed by the x-rays was less than was actually present as plaintiff, because of the long brace wearing period, could not move his back sufficiently to show the true range of motion in his spine. It was Dr. Gilly’s opinion that the fusions were not likely to heal anymore than they had and that if such proved to be the case, plaintiff would have to undergo another operation called a posterior lateral fusion at all three levels. This involves the attachment of bone splints to the back of the spine along the affected area and costs from $1,500 to $2,000.
Dr. Jackson disagreed that plaintiff would probably have to undergo another operation, and felt that he would be able to live reasonably well with what he has. He opined that plaintiff had a permanent optimum disability of forty per cent overall and sixty per cent of his spine, figures in which Dr. Gilly concurred. His disability will probably be greater, however, as complete success of the operation does not seem certain. Both physicians considered plaintiff totally and permanently disabled from any form of hard manual labor.
All three of these physicians, as well as two others, Dr. Raeburn C. Llewellyn and Dr. Edward T. Haslom, who also examined plaintiff, opined that the plaintiff’s difficulties were probably the result of the accident of November 23, 1966. This, in spite of the fact that plaintiff had been involved in a previous accident in June of 1965, wherein he sustained a mild injury to his *235 low back and more serious injuries to his neck. Dr. Sagrera, who also treated plaintiff after the 1965 accident, specifically testified that plaintiff had no complaints relative to his lower back after June 30, 1965, that he had ruled out any possibility of a disc injury, and that the previous accident did not cause the ruptured disc found after the 1966 accident. It appears that whatever injury plaintiff may have suffered to his low back in 1965 was long since healed and asymptomatic in November of 1966.
The fact that the low back pain did not manifest itself until some two months following the 1966 accident was likewise no deterrent to a finding that the disc injuries resulted from that accident. It was the consensus of the medical opinion that whereas low back pain usually appears immediately upon injury to a lumbar disc, cases in which it does not appear for two months are not unusual. Additionally, the pain in plaintiff’s right leg which was later shown to be due to nerve root compression in the spinal area, was present from the moment of impact, though perhaps it was masked by the more localized pain resulting from the injury to his knee.
Plaintiff’s activities have of necessity been greatly curtailed since the accident. Although he has returned to his employment, he has reduced the number of customers that he sees each week from 120 to 80 and he is forced to return home early each day in order to rest. Thus his earning capacity has been substantially reduced. He attempted to obtain other forms of employment, once as an office worker and once as a general foreman at a tire dealership, but was rejected on both occasions because of his back injuries. An insurance agent testified that because of the back injury he would not even consider selling the plaintiff disability insurance to protect his earnings. Plaintiff’s activities around the house have been reduced to nearly none, and he has become ill-tempered and impatient. He has suffered for six years and continues to experience pain in his back which is sometimes severe in nature.
The trial court awarded plaintiff, as aforesaid, the total sum of $80,000.00, including his special damages of some $12,000.00, not counting the cost of the possible second operation, described by Dr. Gilly as being between $1,500.00 and $2,000.00. Under the rule of Louisiana Civil Code Article 1934(3), and the settled jurisprudence of this state, we may not disturb a trial court’s ruling on the question of quantum unless the trial court has abused its discretion in making the award. Miller v. Thomas, 258 La. 285, 246 So.2d 16; Lomenick v. Schoeffler, 250 La. 959, 200 So.2d 127; Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149. In view of the grevious nature of the injuries and the medical treatment inflicted herein upon a 32-year old head of a household, and the fact that he will suffer their effects for the remainder of his life, we find the award to be abusive of the trial court’s discretion in that it is inadequate. Rather, we opine that a total award of $100,000.00 would better do justice between the parties and would more adequately compensate the plaintiff for his past and future suffering and decreased capacity to earn a living.
For the above and foregoing reasons the judgment of the district court is amended so as to increase the total award from the sum of $80,000.00 to the sum of $100,000.-00, and as thus amended is affirmed. Costs in both this and in the trial court are assessed to defendants-appellants.
Amended and affirmed.
MILLER, J., dissents and assigns written reasons.